JOHN A. WILLIAMS AND OTHERS *vs.* GEORGE A. BROOKS AND ANOTHER.

The plaintiffs were partners under the name of "D. F. Tayler & Co.," and for several years had manufactured and sold hair-pins, which were well known and had a ready sale as "Tayler's Hair-pins" and "D. F. Tayler & Co.'s Hair-pins," the device on the packages, which were put up in pink and yellow wrappers, being used exclusively by them and being well known to the trade. The defendants were also engaged in the manufacture and sale of hair-pins and had procured from one L. B. Taylor the right to mark their packages "L. B. Taylor & Co.," to which was added the words "Cheshire, Conn." In a suit for an injunction against the use of their device it was found that "the size and color of the labels and wrappers and the device printed thereon used by them

Williams v. Brooks.

resembled the plaintiffs' labels, wrappers and devices thereon, to such a degree that they were liable to deceive careless and unwary purchasers who buy such goods with but little examination, but that purchasers who read the entire trade mark and label could not be deceived. It was further found that the defendants adopted the label and device in good faith and in the belief that they were not infringing the plaintiffs' rights." Held that an injunction should be granted. (One judge dissenting.)

And that the injunction should be "against such a use by the defendants of the name of "L. B. Taylor & Co.," in connection with any device upon pink or yellow wrappers inclosing hair-pins of their manufacture, as that the combination would be liable to lead purchasers to believe that hair-pins manufactured by them were manufactured by the plaintiffs.

The defendants were not excused for the use of the label and device by the fact that they acted in good faith and believed that they were not infringing the rights of the plaintiffs. The injury to the plaintiffs remained the same.

The purpose to be effected by an injunction in such a case is not primarily to protect the purchaser, but to secure to the manufacturer the profit to be derived from the sale of his goods to all who may desire and intend to purchase them.

And held that, for the purpose of proving that the defendants' packages with their labels so closely resembled those of the plaintiffs as to mislead an ordinary purchaser, wholesale dealers in hair-pins might testify as experts.

Suit for an injunction against the use of a trade-mark and for an account and payment of profits; brought to the Superior Court. Facts found by a committee, and case reserved, upon the report and a remonstrance against its acceptance, for the advice of this court. The case is fully stated in the opinion.

C. R. Ingersoll and H. E. Pardee, for the plaintiffs.

H. Stoddard and H. L. Hotchkiss, for the defendants.

PARDEE, J. The plaintiffs are now, and for ten years last past have been, partners under the name and firm of D. F. Tayler & Co., at Birmingham, England, manufacturing among other articles hair-pins of different sizes and qualities, some of them known as "best double japanned," "plain" and "curvilinear;" these were gathered into ounce packages, the curvilinear in pink, the plain in yellow paper; these were made into pound packages; these last into pack-

ages weighing six, twelve and eighteen pounds, wrapped in brown or drab paper, and in this last form were brought into the United States, where by reason of their superior quality they had a good reputation and ready sale under the name of "Tayler's Hair-pins," "Tayler's Plain Hair-pins," "Tayler's Curvilinear Hair-pins," and "D. F. Tayler & Co.'s Hair-pins."

The device or trade-mark printed upon the wrapper of each ounce package has been used exclusively by the plaintiffs during the past ten years upon their pins sold in the United States, and has become, and is, in combination with the pink and yellow wrappers, well known to the trade. The device upon each ounce package can be seen only in part when these are gathered into pound packages.

Since 1879 the defendants have manufactured, put up, and sold in the United States, curvilinear and plain hair-pins in ounce packages; the former in pink and the latter in yellow wrappers, upon which there is the printed statement that the hair-pins were manufactured by L. B. Taylor & Co., Cheshire, Connecticut, and the finding is that "the size and color of the labels and wrappers and the trade-mark or device printed thereon on the ounce packages used by the defendants  *  *  resemble the plaintiffs' labels, wrappers and devices thereon used on ounce packages  *  *  to such a degree that they are liable to deceive careless and unwary purchasers, who buy such goods hastily and with but little examination; but purchasers who read the entire trade-mark and label on the defendants' goods cannot be deceived, nor mistake the defendants' goods for the plaintiffs'." The defendants used their label with full knowledge of the plaintiffs' trade-mark and of the reputation of their hair-pins in the United States.

All manufacturers of hair-pins put them in ounce packages, combining the ounce into pound, and the pound into packages of six or more pounds; and many inclose the ounce packages in pink and yellow paper.

Generally, the defendants sold their hair-pins to jobbers in six pound packages or more, rarely retaining them in ounce

packages. Nothing in the appearance of the six pound packages would mislead jobbers or wholesale dealers as to the place of manufacture.

The defendants have always sold their pins as of domestic manufacture, and for a less price than that obtained by the plaintiffs; and when their ounce packages are looked at separately, the words "Cheshire, Conn." plainly appear; but when these are gathered into pound packages the whole of the printed label is not seen.

In 1869 Levi B. Taylor and his father Milo A. Taylor were manufacturing hair-pins in Massachusetts as partners under the name of L. B. Taylor & Co., and inclosing ounce packages in wrappers having printed thereon a label substantially like the one of which the plaintiffs now complain. In that year, upon the death of the father, Levi B. Taylor sold the tools, machinery and stock, together with a quantity of these wrappers, with the right to use the same, to the Connecticut Cutlery Company of Naugatuck in this state, and subsequently became president thereof. In 1875, when the defendants began to manufacture hair-pins at Cheshire in this state, Levi B. Taylor closed his connection with the Connecticut Cutlery Company, and became and still continues to be a traveling salesman for them, his remuneration depending upon the amount of sales effected by him; and it was orally agreed between them that they should have the right to use the name of "L. B. Taylor & Co." upon such hair-pins of full weight as they should manufacture and that he should have the exclusive sale of them. Both parties have observed this contract, and under the authority thus given the defendants placed the name of "L. B. Taylor & Co." upon packages of hair-pins; the name being printed in imitation of the signature made by L. B. Taylor.

In 1879, the defendants having manufactured and sold hair-pins inclosed in a wrapper upon which was printed a device and a statement that the pins were manufactured by "L. B. Taylor & Co.," and which resembled the one used by the plaintiffs, the latter claimed damages for the injury

resulting therefrom to their business. A compromise was effected, and as part consideration therefor the defendants signed an agreement thereafter to desist from any infringement of the plaintiffs' legal or equitable rights in or to their device within the United States. The committee annexed a copy thereof to his report, marked as exhibit 13.

The device and label complained of were subsequently adopted by the defendants upon the advice of counsel, in good faith, and in the belief that it is not an infringement of the plaintiffs' rights.

Conceding as a general rule to all persons the privilege of selecting the name under which they will transact business, yet the defendants have no right to destroy or diminish the property of the plaintiffs in the name of "D. F. Tayler & Co." and in the device and vignette with which it is connected, applied to the manufacture and sale of hair-pins, by so printing the name of "L. B. Taylor & Co.," not borne by either of them, but purchased solely for use in connection with this particular branch of their business, as part of a device and vignette upon a pink or yellow wrapper inclosing an ounce of hair-pins, as that their entire device shall so closely resemble that of the plaintiffs as to be liable to deceive careless and unwary purchasers; and this regardless of the fact that the defendants believed their manner of use of the name and vignette to be within the law; for the injury to the plaintiffs remains the same.

In *Croft* v. *Day*, 7 Beav., 84, the Master of the Rolls said (p. 89): My decision does not depend upon any peculiar or exclusive right the plaintiffs have to use the name of "Day & Martin," but upon the fact of the defendants using their name in connection with certain circumstances, and in a manner calculated to mislead the public, and to enable the defendant to obtain, at the expense of Day's estate, a benefit for himself, to which he is not in fair and honest dealing entitled. * * He has the right to carry on the business of a blacking manufacturer honestly and fairly; he has the right to the use of his own name. I will not do anything to debar him from the use of that or any other name calcu-

lated to benefit himself in an honest way; but I must prevent him from using it in such a way as to deceive and defraud the public."

In *Thorley's Cattle Food Co.* v. *Massam*, 42 Law Times, (N. S.,) 851, BRAMWELL, L. J., said : "It is said it is hard if a man has the name of Thorley that he cannot make food and call it 'Thorley's Food.' So he may, but if unfortunately for him some preceding Thorley has carried on the business of making cattle food in such a way that by the name "Thorley's Cattle Food" is understood the manufacture of that man, then the second Thorley, or the man who assumes his name, must take care so to conduct his business that he is not mistaken for the original Thorley, and if he wilfully, or even I should say without wilfulness, does carry on his business so as to be mistaken, he must be restrained from doing it; and really there is no hardship upon him at all."

In *Holloway* v. *Holloway*, 13 Beav., 209, the Master of the Rolls said : "The defendant's name being Holloway he has a right to constitute himself a vendor of Holloway's pills and ointment, and I do not intend to say anything tending to abridge any such right. But he has no right to do so with such additions to his own name as to deceive the public and make them believe that he is selling the plaintiff's pills and ointment."

The purpose to be effected by this proceeding is not primarily to protect the consumer but to secure to the plaintiffs the profit to be derived from sale of hair-pins of their manufacture to all who may desire and intend to purchase them. It is a matter of common knowledge that many persons are in a greater or less degree careless and unwary in the matter of purchasing articles for their own use ; but their patronage is not for that reason less profitable to the manufacturer; and when such persons have knowledge of the good qualities of the plaintiffs' hair-pins and desire to purchase them, the law will not permit the defendants to mislead them.

In *Meriden Britannia Company* v. *Parker*, 39 Conn., 450, the finding is that the respondent's stamps "resembled the

petitioners' trade-mark  *  *  to such a degree that they are calculated to deceive and do deceive unwary purchasers and those who buy such goods hastily and with but little examination of the trade-mark,  *  *  but purchasers who read the entire trade-mark on the respondent's goods  *  * cannot be deceived." The court said: "The fact that careful buyers are not deceived does not materially affect the question. It only shows that the injury is less, not that there is no injury. Another class of purchasers to whom large quantities have been sold are deceived. Such purchasers perhaps will have no reason to complain, as they, if they are injured by the deception, must attribute the injury to their own want of diligence. But the petitioners stand on entirely different ground. No amount of diligence on their part will guard against the injury. An injunction is their only adequate remedy; and to that we think they are entitled."

In *Singer* v. *Wilson*, 3 L. R., Appeal Cases, 376, Lord O'HAGAN said; "I think we should be cautious in holding that although a person of intelligence and observant habits might, in a case like this, by exercising reasonable vigilance, escape misleading, there should be no restrictive interference to prevent others from being misled. It is a question of degree, of more or less; there can be no rigid rule, and the special facts must be considered in every case. There are multitudes who are ignorant and unwary, and they should be regarded in considering the interest of traders who may be injured by their mistakes. If one man will use a name, the use of which has been validly appropriated by another, he ought to use it under such circumstances and with such sufficient precautions that the reasonable probability of error should be avoided, notwithstanding the want of care and caution which is so commonly exhibited in the course of human affairs."

The defendants insist that the committee erred in receiving their written promise to abstain from any infringement of the plaintiffs' rights in or to their trade-mark. The objection is not well taken. The complaint is that the

defendants have wilfully disregarded the plaintiffs' rights; it was the privilege of the latter to prove this allegation; and this written promise of the defendants bore directly upon the question of their good faith in the formation and use of their present device; and although this alone, of all items of evidence bearing upon that question introduced on one side and the other, is set forth in connection with the report of the committee, yet, inasmuch as the finding is that the defendants acted in good faith, we are unable to see that its presence works any injury to them. Indeed neither its presence nor its absence can at all affect the advice to be given to the Superior Court.

For the purpose of proving that the defendants' ounce packages of hair-pins so closely resembled those of the plaintiffs as to mislead an ordinary purchaser and consumer, the plaintiffs offered the testimony of several persons, who were or had been wholesale dealers in hair-pins in New York and Philadelphia, as experts. The committee received the evidence notwithstanding the defendants' objection. We see no error in this.

In *Gorham Company* v. *White*, 14 Wallace, 511, the testimony of die-sinkers, designers, editors of scientific publications, solicitors of patents, and dealers, was received upon the question whether ordinary purchasers would be misled by the similarity between two designs for forks and spoons. And in *In re Worthington Co.'s Trade-mark*, 14 L. R. Chan. Div., 8, brewers deposed that in their opinion a proposed trade-mark for ale would be calculated to deceive, "as the two marks might, and probably would, be exhibited together in houses where fermented liquors are sold." JESSEL, M. R., said:—" Now is such a trade-mark intended to deceive, or is it calculated to deceive? I have evidence before me to show that people would be deceived." In the first cited case especially, some of the testimony was from witnesses who are not shown to have ever been dealers in any manner in the articles concerning the appearance of which they expressed an opinion.

The question in the case before us is, does the defendants'

trade-mark so closely resemble that of the plaintiffs' that it is liable to deceive purchasers; a matter which is to be determined by the eye, largely by the eye of the trier doubtless. And in view of these authorities we think it may properly be instructed by men who have looked at the packages in question with the interested and careful eye of a dealer.

The trade-mark for injury to which the plaintiffs complain is not theirs by creation, but by purchase, and one of them identifies it by stating the time and place of its origin and the mode of acquisition by themselves. He deposes, partly upon information and partly of knowledge, that it was established by Daniel Foot Tayler and Henry Shuttleworth of Gloucestershire, more than thirty-seven years since, and that it passed in 1843 from them to John Alfred Williams and Peter Eddleston and from these last to the plaintiffs. But the finding of the committee is as follows:—"When the firm composed of John Alfred Williams and Peter Eddleston was dissolved does not appear, nor how Peter Eddleston's interest was transferred to the present firm, if it ever was. Nor does it appear how the interest of Daniel Foot Tayler was transferred to the firm composed of John Alfred Williams and Peter Eddleston, if it ever was."

In the absence of proof of injury to the plaintiffs in the past and the finding being only that the ounce packages of the defendants "are liable to deceive purchasers," our advice to the Superior Court will concern the future only.

The Superior Court is advised to pass a decree restraining the defendants from such use of the name of "L. B. Taylor & Co.," in connection with any device upon pink or yellow wrappers inclosing hair-pins of their manufacture, as that the combination will be liable to lead purchasers to believe that hair-pins manufactured by the defendants were manufactured by the plaintiffs, when, upon a further hearing to be had for that purpose only by said court, the plaintiffs shall complete the proof of title in themselves to the device and trade-mark claimed in their complaint.

In this opinion PARK, C. J., and LOOMIS, J., concurred.

CARPENTER, J., (dissenting.) I cannot concur in the result to which my brethren have come. The only gro for an injunction is to prevent the defendants from defi ing the plaintiffs. To justify an injunction it should be reasonably certain that the plaintiffs will be defrauded. There is no intention to defraud, for it is expressly found that the defendants acted in good faith. It is not found that the defendants, in a single instance, or others, have sold the defendants' goods as the plaintiffs'; and it is not reasonably certain that such will be the result in the future. The only part of the finding which indicates such a result is the following:—" The size and color of the labels or wrappers and the trade-mark or device printed thereon on the ounce packages used by the defendants as hereinbefore stated, resemble the plaintiffs' labels, wrappers and device thereon used on ounce packages as hereinbefore stated, to such a degree that they are liable to deceive careless and unwary purchasers who buy such goods hastily and with but little examination; but purchasers who read the entire trade-mark and label on the defendants' goods cannot be deceived or mistake the defendants' goods for the plaintiffs'."

It will be observed that the name " Taylor & Co.," as an essential or material feature of the case, is carefully excluded. Three things only are important—the device, and the size and color of the labels. The plaintiffs claim nothing from the device or trade-mark proper. Hence that may be laid out of the case. In respect to the size the finding is that "in general all hair-pin makers put up their goods in similar sized packages, wrapped around with a paper of the size and shape of exhibit No. 1,"—the plaintiffs' wrapper or label. As to color it is found that " pink and yellow papers of substantially the same shape and size and shade of the paper used by the plaintiffs in this case are used by other hair-pin manufacturers in putting up their goods for market." How, under this finding, the plaintiffs can have any right superior to that of the defendants, to the use of labels of the size, shape and color of those used by other manufacturers generally, is beyond my comprehension.

But assuming, as I think a majority of the court must assume, that the imitation consists in the general arrangement and appearance of the labels, including of course the name as an important feature of it, still I contend that the plaintiffs have suffered and are in danger of suffering no legal damage. " Liable to deceive " purchasers. That is not equivalent to finding that they will be deceived, or that they will probably be deceived, or that the arrangement is calculated to deceive. And it certainly falls far short of showing that it is reasonably certain that they will be deceived. It indicates a possibility, but not necessarily a probability. A man is liable to be struck by lightning, but hardly one in a million ever experiences it. If that is objected to as an extreme case, take another illustration. Every man who travels by railroad or steamboat is liable to be injured by some accident, and yet hardly one in ten thousand is so injured. I use these illustrations for the purpose of showing that a liability ordinarily imports less than a probability.

It will be claimed however that the word as used in this finding is used in a different sense, or at least that it must be interpreted with reference to the subject matter to which it is applied. That I readily grant; and I concede all that I think can be reasonably claimed, that it shows that there is an even chance that some purchasers will be deceived. What if some few of the many millions of those who use hair-pins are led to purchase the defendants' goods supposing them to be the plaintiffs' ? When we consider that it is only consumers that are liable to be deceived—for it is expressly found that dealers are not—and that each consumer purchases in small quantities, paying therefor a mere trifle, it is obvious that the loss of profits to the plaintiffs from that source will be very small and that it will require large numbers of persons to be thus misled before the loss will be appreciable. The finding fails to show that that will be the result. The loss of profits may and probably will be infinitesimal. Courts of equity do not grant injunctions for trifling matters. On the other hand the loss may be

considerable; but that is uncertain; the court is called upon to act, not upon facts but upon conjecture. It seems to me much better that the plaintiffs should be required to wait until they can show positively that they will suffer material damage before asking for an injunction.

Again; it is only the careless and unwary that are liable to be deceived. The consumer who knows the plaintiffs' goods and really desires to buy them will be vigilant and know what he buys. He cannot be deceived. The consumer who does not know them, or who has no particular preference for them, will be careless and unwary, or in other words indifferent. No manufacturer has a better right than others to the trade of that class. That is open to legitimate competition; and when a customer is secured by one, so long as there is no fraud actual or constructive and no deception, there can be no injury in a legal sense to another.

I take it that this proposition cannot be controverted, that no injunction can properly issue unless the defendant represents or is about to represent in some manner or by some means that the goods which he makes and sells are the goods of another. When his purpose to do so clearly appears the case is free from difficulty and courts will protect the injured party in respect to all classes of purchasers. But when, as in this case, the resemblance is not designed, but is incidental, and results solely from the similarity of names in connection with the style and manner of preparing the goods for market, which style and manner are common to all manufacturers, the case is different, and courts ought to proceed with more caution. This distinction is an important one, and seems to me not to have been considered by the majority of the court. To cases of the former class the language of the courts as cited in the majority opinion may well apply. But it cannot be applied indiscriminately to cases of the latter class without danger of doing injustice. There is a rule however applicable to these cases which is well established. I quote from some of the authorities, both English and American:—

In *I. W. Thorley's Cattle Food Co.* v. *Massam,* 42 Law

Times, (N. S.) 856, BAGGALLAY, L. J., says:—"Have the company, in offering for sale the article manufactured by them, made representations which were *calculated to induce a reasonable belief* on the part of those to whom the offers were made that the articles were manufactured by Joseph Thorley?" In *Leather Cloth Co.* v. *American Leather Cloth Co.*, 11 House of Lords Cas., 535, the Lord Chancellor says:—"All which can be done is to ascertain in every case as it occurs whether there is such a resemblance as to deceive a purchaser using ordinary caution." In *McLean* v. *Flemming*, 96 U. S. Reps., 245, CLIFFORD, J., says:—"Colorable imitations which require careful inspection to distinguish the spurious trade-mark from the genuine are sufficient to maintain the issue; but courts of equity will not interfere when ordinary attention by the purchaser would enable him at once to discriminate the one from the other. When the similarity is sufficient to convey a false impression to the public mind, and is of a character to mislead and deceive the ordinary purchaser, in the exercise of ordinary care and caution in such matters, it is sufficient to give the injured party a right of redress if he has been guilty of no laches. What degree of resemblance is necessary to constitute an infringement is incapable of exact definition as applicable to all cases. All that courts of justice can do in that regard is, to say that no trader can adopt a trade-mark so resembling that of another trader, as that ordinary purchasers, buying with ordinary caution, are likely to be misled. When therefore a party has been in the habit of stamping his goods with a particular mark or brand, so that the purchasers of his goods having that mark or brand know them to be of his manufacture, no other manufacturer has a right to adopt the same stamp; because, by doing so, he would be substantially representing the goods to be the manufacture of the person who first adopted the stamp, and so would or might be depriving him of the profits he might make by the sale of the goods which the purchaser intended to buy." This last remark is substantially in the language of Lord Chancellor CRANWORTH in *Seixo* v. *Provezende*, L. Reps., 1 Chancery Appeals, 196. "The court is not bound to

interfere where ordinary attention will enable purchasers to discriminate between the trade-marks used by different parties." *Popham* v. *Cole*, 66 N. York, 76. If the trade-mark "would not probably deceive the ordinary mass of purchasers an injunction will not be granted." *Blackwell* v. *Wright*, 73 N. Car., 310. "All the authorities agree that the court will not restrain the defendant from the use of a label on the ground that it infringes the plaintiff's trade-mark, unless the form of the printed words, the words themselves, and the figures, lines and devices, are so similar that any person with such reasonable care as the public generally are capable of using and may be expected to exercise, would mistake the one for the other." *Gilmore* v. *Hunnewell*, 122 Mass., 139.

These quotations indicate to my mind the true rule. The imitation or resemblance must be of such a character as to amount to a representation that the goods which the defendants make are goods made by the plaintiffs. It necessarily follows that before there can be any legal injury the representation *must be believed by the purchaser.* The careful and vigilant purchaser examines and takes pains to know before he purchases; and if he purchases the defendants' goods for the plaintiffs', it is because he believes them to be such. On the other hand the careless and unwary purchaser takes little or no pains and purchases without any real belief on the subject. He may have a vague and indefinite notion, but it does not amount to a belief, so that it can be truly said of him that he has been misled.

This illustrates at once the distinction, and the reasonableness of the rule, for which I am contending. The careless and unwary purchases the goods made by one man, not because he believes they were made by another, but because he is so far indifferent that he takes no pains to ascertain. He has not been legally misled. The cautious man purchases them because he believes they were made by another. He has been misled.

Hence the propriety of the rule that the imitation must be calculated to deceive purchasers of ordinary caution.

For these reasons I think the injunction should not issue.