STATE OF CONNECTICUT v. ALVIN L. TRUMBULL

APPELLATE DIVISION OF THE CIRCUIT COURT

FILE NO. CR 7-0662

Argued April 6—decided October 1, 1962

*Edward R. Doyle,* of Hartford, for the appellant (defendant).

*James A. Varrone,* prosecuting attorney, for the appellee (state).

KOSICKI, J. The defendant was convicted, after a trial to the court, on four counts for violation of § 53-347,[1] relating to the forging or counterfeiting of manufacturers' labels, and on a charge of conspiracy to violate § 53-347, which offense, under the provisions of the conspiracy statute, § 54-197, is a misdemeanor. In his appeal, the defendant has assigned a number of errors. For simplicity and convenience, consistent with the rights of the defendant, these may be classified as follows: (1) Failure of the court to find certain facts which were admitted or undisputed; (2) failure to correct the finding by striking therefrom numerous subordinate findings of facts; (3) the addition by the court of certain findings at the request of the state; (4) error in all of the conclusions of the court; and (5) the general assignment of error in the ultimate conclusion that upon all the evidence the defendant was guilty of the crimes charged beyond a reasonable doubt.

[1] "Sec. 53-347. FORGING OR COUNTERFEITING STAMPS OR LABELS. Any person who uses, forges or counterfeits the individual stamp or label of any mechanic or manufacturer, with intent to defraud another, or vends or offers to vend any goods having any such forged or counterfeited stamp or label thereon, knowing it to be forged or counterfeited, without disclosing the fact to the purchaser, shall be imprisoned not more than six months or fined not more than one hundred dollars or both."

All but the last assignment have reference to the finding, and the ultimate question raised by these assignments is essentially the same as that presented by the final claim, namely, that the court upon all the evidence erroneously found the accused guilty beyond a reasonable doubt. Upon this last assignment of error, it is seldom necessary for the protection of the defendant's rights to examine in detail the numerous exceptions the defendant makes to the finding. *State* v. *Guilfoyle,* 109 Conn. 124, 139; *State* v. *Pundy,* 147 Conn. 7, 8. A finding in a criminal case tried to the court does, however, perform a useful function in that it serves to show the conclusions reached by the court on conflicting evidence, which conclusions, if reasonably reached, must be accepted. *State* v. *Simborski,* 120 Conn. 624, 626. The finding becomes material only in the event of a claim that the conclusion of the court as to the defendant's guilt was not properly supported by the facts found as distinguished from the evidence. *State* v. *Zack,* 109 Conn. 29, 30; see *State* v. *Plant,* 22 Conn. Sup. 436, 442 (App. Div.). In deference to the insistence of counsel and in recognition of the large amount of effort expended in the preparation of the finding and the exceptions thereto, we have given careful and detailed consideration to all of the claims for correction. We can perceive no changes which could be made in the subordinate facts or conclusions drawn from them which would be of any advantage to the defendant or would materially affect the support given by them to the ultimate conclusion reached.

The evidence shown by the finding to have been accepted by the court as true, supplemented by the inferences the court could reasonably draw, may be summarized as follows: The defendant engaged in the business of engineering, manufacturing, designing, inspecting and packaging bearings in a shop

located in Meriden. In June, 1960, he and George Humphrey, a printer, agreed at a meeting in Meriden to undertake the manufacture of cardboard bearing boxes imprinted with the labels and trademarks of known bearing manufacturers, referred to herein as Fafnir, New Departure, Norma-Hoffman, and S.K.F. The purpose of this operation was the sale of surplus bearings of these manufacturers as the bearings might be acquired from the United States government or other sources at a small fraction of the cost of new bearings as sold by the manufacturers. Such sales were intended to be under the pretense that the surplus bearings were in fact new bearings legitimately offered for sale as such. The defendant and Humphrey agreed to manufacture such boxes and containers and the defendant agreed to sell them to others engaged in the business of marketing bearings. The defendant also agreed to procure surplus bearings for packaging in the counterfeit boxes and to arrange for the sale of the boxes or the disposition of the packaged bearings. It was agreed that the proceeds from such sales, after expenses, were to be divided equally between the defendant and Humphrey. The defendant furnished the required capital for the purchase of printing, engraving and box-making equipment and other needed materials, in New York and elsewhere, all of which were delivered to Humphrey's shop in Massachusetts. Payment was made by the defendant through checks drawn on his account in a bank in Meriden.

Using the genuine original boxes and labels of Fafnir, New Departure, Norma-Hoffman, and S.K.F. bearings as samples, Humphrey designed art work necessary to duplicate the labels of these manufacturers. Printing plates were then made by a company in Massachusetts. Humphrey cut and printed a large number of boxes of various sizes,

duplicating in size and appearance boxes used in the packaging and sale of bearings of the manufacturers mentioned. All of these boxes had printed thereon the counterfeit labels and trademarks, as well as distinguishing code numbers, of such manufacturers without their knowledge or consent. During the period from July, 1960, to May, 1961, counterfeit unpackaged boxes of all of such manufacturers, in quantities as high as 50,000 to 60,000 at a time, were shipped or delivered by Humphrey to the defendant in Meriden and Simsbury, Connecticut. On a number of occasions during this period, the defendant sent to Humphrey surplus bearings to be wrapped and packaged by him in the counterfeit boxes; these were thereafter delivered by Humphrey to the defendant in Meriden. The defendant stored quantities of unpackaged boxes bearing counterfeit labels of Fafnir, New Departure, Norma-Hoffman and S.K.F. in his plant at Meriden and from there would sell or offer them for sale to others. Many thousands of unpackaged boxes with counterfeited labels were sold by the defendant at the rate of 2 percent of the list price of the manufacturer's genuine package containing bearings. The defendant received a higher price for the counterfeit boxes than he would have received for the same boxes without the counterfeit labels. He dealt with one Granowitz, who was a dealer in surplus bearings having a place of business in New York City. He led Granowitz to believe that if Granowitz sent the defendant surplus bearings for packaging, he would package them in individual, genuinely labeled boxes of the respective manufacturers. Granowitz sent such surplus bearings to the defendant, who packaged them in counterfeit boxes and shipped them to Granowitz by motor freight, railway express and parcel post. Payments from Granowitz, by check of Bearings, Limited, were received by the defendant in Meriden; the checks were endorsed by him

and deposited in the Puritan Bank and Trust Company in Meriden; and the defendant drew money from this account. Payments from this account were made to Humphrey. The profits from these operations, divided between the defendant and Humphrey, amounted to not less than $16,000. The undivided profits amounted to $6000. All four of the manufacturers named suffered loss of sales as a result of these operations.

The defendant claims that no violation of § 53-347 had been proved beyond a reasonable doubt in that the state had failed to establish certain essential elements of the charge; these we shall examine in detail. Each of the four counts, as augmented by the bill of particulars filed by the prosecution, and as relied on by the accused for his defense, in the light of the proof adduced on trial charges the defendant with the use, forgery or counterfeiting of the label of one of the manufacturers named, with intent to defraud another, or vending or offering to vend any goods having such forged or counterfeited label thereon, knowing it to be forged or counterfeited, without disclosing the fact to the purchaser.

There is no reported case construing the provisions of § 53-347. The statute is an old one, its prototype having been first enacted in 1847. Although in subsequent revisions its wording had been simplified and its provisions condensed, nevertheless its scope and purpose, as well as the definition of the prohibited acts, have remained substantially unchanged.[2] At the time the original statute was passed, the common-law and the general principles of equity respecting the use of trademarks and labels were accepted in this state; and, in numerous

---

[2] Statutes, 1849, pp. 246, 247, §§ 119, 120; Statutes 1854, p. 335, §§ 119, 120; Rev. 1866, p. 274, §§ 180, 181; Rev. 1875, p. 523, § 2 (first condensation); Rev. 1888, § 1577; Rev. 1902, § 1407; Rev. 1918, § 6510; Rev. 1930, § 6359; Rev. 1949, § 8685.

civil cases since then, our courts have granted equitable relief against the infringement of trademarks and acts of unfair competition. See such cases as *Bradley* v. *Norton,* 33 Conn. 157; *Boardman* v. *Meriden Britannia Co.,* 35 Conn. 402, 413; *Meriden Britannia Co.* v. *Parker,* 39 Conn. 450, 457, 460; *Kimball* v. *Hall,* 87 Conn. 563; *Middletown Trust Co.* v. *Middletown National Bank,* 110 Conn. 13; *Yale Co-operative Corporation* v. *Rogin,* 133 Conn. 563; *Transparent Ruler Co.* v. *C-Thru Ruler Co.,* 135 Conn. 181. The construction to be placed on the statute in question should be such as would be in harmony with the decisions of our courts in analogous situations involving civil wrongs, and such as would give due regard to the identity of principles governing these situations. The public interest contemplated by the statute is to promote honest and fair dealing in the sale or distribution of goods under distinctive labels. This purpose is served by protecting the unwary purchaser against deception and by safeguarding the property interest of the honest and reliable manufacturer in the goodwill he had acquired in the means used to identify his product. The words "forge" and "counterfeit" are used synonymously and in their broad sense, meaning the fabrication of a false representation or an imitation; the making of a copy without authority or right and with a view to deceiving or defrauding by passing the copy as an original or genuine. Ballentine, Law Dictionary (2d Ed.). In other statutes dealing with similar subject matter, the words "counterfeit" and "imitate" are used interchangeably. General Statutes §§ 35-4— 35-11 (trademarks); §§ 35-12—35-18 (trade-union labels).

The defendant concedes that the labels and packages in evidence were "imitations" but denies they were "forgeries" or "counterfeits." This distinction

is without substance. All of the labels and the boxes manufactured, used and sold by the defendant and Humphrey were copied with such minute precision and exactness as to deceive experts skilled in the art of printing and packaging and who dealt with and were thoroughly familiar with the genuine labels and boxes. The court's conclusion that all of the labels in this case were forgeries or counterfeits was the only one it could reasonably reach. See *State* v. *Barnett,* 109 N.J.L. 193, where a conviction under a statute closely resembling ours was upheld on somewhat similar facts.

The defendant further claims that no criminal act was committed by him in Connecticut; that whatever may have been done in violation of the statute was performed by Humphrey in Massachusetts; that what sales or offers to sell were made took effect and occurred in New York; that Granowitz and not the defendant owned the surplus bearings packed by the defendant, and therefore there could be no sale of such bearings under a counterfeit label in fraud of Granowitz; that Granowitz was aware of the forged or counterfeit labels and packages and there was full disclosure to him; that the delivery by Humphrey to the defendant in Simsbury was at variance with the information charging that the crime or crimes were committed in Meriden; and that no damage or injury to any purchaser was proved.

It is true that the fabrication of the counterfeit labels and boxes occurred in Massachusetts. That was but the first step essential to accomplish the use, forgery or counterfeiting of the labels of Fafnir, New Departure, Norma-Hoffman and S.K.F. The "use" referred to in the statute is not to be construed narrowly, as contended by the defendant, that is, that its meaning must be restricted to the actual process of reproducing the label. If such

were the true interpretation, the word "use" in the statute would be redundant. "[I]n construing a statute, every part should, so far as possible, be made operative." *Hurlbutt* v. *Hatheway,* 139 Conn. 258, 262. We take the statute to mean what the original statute expressed: "Every person who shall . . . use, forge, or counterfeit, or cause or procure to be used, forged, or counterfeited, upon any goods, wares, or merchandise, the individual stamp or label of any . . . manufacturer, with intent to defraud the purchasers or manufacturers of any goods, wares, or merchandise whatever," shall be punished. Statutes, 1849, p. 246, § 119.[3] In a separate provision were contained prohibitions against vending or offering to vend counterfeit merchandise. Id., p. 247, § 120. In the Revision of 1875 (Rev. 1875, p. 523, § 2), these two sections were combined and condensed into what is now General Statutes § 53-347. This objective of compression and abbreviation was characteristic of the Revision of 1875. See *Miller* v. *Phoenix State Bank & Trust Co.,* 138 Conn. 12, 16. "There is a presumption that a general revision of the statutes does not change the law . . . ." Ibid.; see *State* v. *DeGennaro,* 147 Conn. 296, 303; *Wilson* v. *Miller,* 144 Conn. 212, 216; *Norwalk* v. *Daniele,* 143 Conn. 85, 87; *Castagnola* v. *Fatool,* 136 Conn. 462, 468.

Among other things, the statute prohibits the use, upon any goods, of the individual stamp or label of any manufacturer, with intent to defraud another. It was not necessary for the state to prove actual damage to the named manufacturers, although evidence was produced to show injury through loss of or reduction in sales. The gist of the offense is the probable or consequential injury to the person aggrieved, arising out of the impair-

---

[3] This statute had received no further legislative action except through the approval of subsequent revisions and codifications.

ment of his goodwill and reputation and the potential adverse effect on his market, and the imposition on the public through its deception regarding the origin of the merchandise. See, for example, *Boardman* v. *Meriden Britannia Co.*, 35 Conn. 402, 413; *Holmes, Booth & Haydens* v. *Holmes, Booth & Atwood Mfg. Co.*, 37 Conn. 278, 296; *Meriden Britannia Co.* v. *Parker*, 39 Conn. 450; *Williams* v. *Brooks*, 50 Conn. 278, 283; *Hygeia Distilled Water Co.* v. *Hygeia Ice Co.*, 70 Conn. 516, 533.

The evidence amply sustains the conclusions of the court that such unlawful use was made by the defendant in his receiving, storing, and selling the counterfeit labels and boxes at his place of business in Meriden, as well as packing used bearings in his plant in the admittedly counterfeit boxes; and that all of this was done with intent to defraud each of the four manufacturers and eventually to defraud the ultimate retail purchaser. The word "use" is not to be construed so strictly as to require proof of personal execution of the prohibited acts; the statute permits a broader construction and includes procuring or causing such acts to be done.

Nor is there error in the conclusion of the court that the defendant was guilty of vending or offering to vend such counterfeit merchandise without disclosing the fact to the purchaser. The court found that Granowitz was deceived through the representation of the defendant that the counterfeit boxes were in fact genuine and that sale of them to him and to others occurred in Meriden. The goods were shipped from Meriden, payment for them was made in Meriden, and remittances to Humphrey were made from Meriden. The principal business of selling the counterfeit goods, including all the usual and necessary activities attending the promotion, sale, and distribution of merchandise, was conducted by the defendant from his office in Meriden.

The defendant contends that he could not be found guilty under the vending clause in the statute because a sale is not completed until the article is delivered, and since delivery was not made in Connecticut, no crime was committed here. Reliance is placed by him on civil cases dealing with the passing of title, the responsibility for risk after delivery to a carrier and, in general, breach of contract of sale. While such decisions are not deemed applicable here, it may be pointed out that under the relationship existing between the defendant and at least one of the buyers in New York, the court was justified in finding that the sale was completed in Connecticut by delivery to a carrier, which thereupon became bailee for the buyer. See *Illustrated Postal Card & Novelty Co.* v. *Holt,* 85 Conn. 140, 146.

Under the vending portion of the statute, the state was required to prove that the defendant was guilty of vending or offering to vend the prohibited goods. That did not require proof of a completed transaction or full performance of a contract. It was enough to satisfy the statute if the defendant set in operation at least one act essential to the commission of the crime; and this was amply shown by the defendant's sales negotiations, deliveries to carriers, and financial accounting, all of which occurred in Meriden. It was not incumbent on the prosecution to establish a violation of both parts of the statute. Proof of either, in the requisite degree, was sufficient for conviction.

The defendant also claims that the evidence shows only one delivery of counterfeit boxes to him in Connecticut and that occurred in Simsbury, which is located in a circuit other than the one in which the trial took place. The finding of the court, sustained by evidence, is otherwise and must be accepted. *State* v. *Simborski,* 120 Conn. 624, 626. Moreover,

there was no error in the finding as to the delivery in Simsbury. This subordinate fact was relevant to the fifth count of conspiracy. Objection to it was not raised in the trial court; the objection, if any, relates to venue and not to jurisdiction, as claimed. If there was a variance between proof and the allegation of place in the information and the bill of particulars, this was amendable; there having been no objection, the defect, if any, is considered waived. See *State* v. *Phillips,* 22 Conn. Sup. 353, 355 (App. Div.); Maltbie, Conn. App. Proc. § 306; *State* v. *McGee,* 80 Conn. 614, 617; Practice Book § 352; Cir. Ct. Rule 1.1.1.

The fifth count in the information charges the defendant with conspiracy to violate § 53-347. The crime of conspiracy is a separate offense, distinct from and independent of the criminal or unlawful act which is the object of the conspiracy. See *State* v. *Faillace,* 134 Conn. 181, 183. In this state, a conspiracy to commit a crime is not merged in the crime committed pursuant to the agreement, and punishment may be imposed for both. *State* v. *Gargano,* 99 Conn. 103, 114; *State* v. *Setter,* 57 Conn. 461; note, 37 A.L.R. 778, 780, 790. There can be no serious dispute that a conspiracy in fact existed between the defendant and Humphrey to sell boxes with counterfeit labels to dealers in surplus bearings. The combination was astutely planned by diversifying operations in three states, thereby making proof for conviction difficult to obtain. The defense consisted mainly in a denial of the fact of conspiracy in that there was no violation of § 53-347; in maintaining that no overt act in furtherance of the conspiracy was committed in this state by the defendant; and in asserting the absence of criminal intent because any act performed by the defendant was done in reliance upon legal advice. In view of the foregoing discussion on the four

counts of violation of § 53-347, it will suffice to say that the state had proved a conspiracy within the definition of § 54-197. The remaining questions are whether the defendant committed in Connecticut an overt act which could make him chargeable with the crime; and, if so, whether he is excused because he acted in reliance upon legal advice and, therefore, lacked the necessary intent to commit the crime of conspiracy.

The act essential to the proof of the crime of conspiracy need be only one performed in furtherance of the conspiracy. It may not be successful toward accomplishing the object of the conspiracy. *State* v. *Devine,* 149 Conn. 640, 649. Of itself, the overt act need not be a criminal act, nor does it need to constitute the very crime that is the object of the conspiracy. *United States* v. *Rabinowich,* 238 U.S. 78, 86. The recital of facts in the above summary discloses numerous acts on the part of the defendant within this jurisdiction, any one of which, beginning with the inception of the unlawful combination in Meriden and its financing by the defendant, and terminating with the successful sales of the counterfeit goods, would constitute an overt act in furtherance of the conspiracy. This claim of the defendant is without merit.

The defendant seeks to excuse himself by pleading reliance on the advice of counsel that what he did was not in violation of the law. The short answer to this argument is that the court obviously did not believe what he said. His testimony on this point is the barest hearsay, and the court could quite properly accord it no credit. Even though the facts were true, they would furnish no defense to the charges contained in any one of the five counts. The axiom is elementary that *ignorance of the law excuses no one*; and refuge from the consequences of one's conscious acts cannot be found behind a wall

of legal advice, be it sound or unsound. The defendant, furthermore, is mistaken as to the rule governing situations where a person acts under misapprehension of the law. Our courts have held that in the case of illegal use of a trade name, amounting to unfair competition, a defendant, in an action in equity, may seek to mitigate damages or ameliorate the decree by showing that he acted in good faith, innocently, by inadvertence, or upon competent legal advice. But, even in civil cases, the rule is that while such reliance on counsel may exonerate the defendant from any intention to do a legal wrong, it does not relieve him from responsibility for the wrong which he committed. See such cases as *Williams* v. *Brooks,* 50 Conn. 278, 282; *Meriden Britannia Co.* v. *Parker,* 39 Conn. 450, 460; *Rogers Mfg. Co.* v. *Rogers,* 38 Conn. 121, 125. The court, in the case at bar, has found as a fact that the defendant intended to engage in the manufacture and sale of counterfeit boxes, packaged or unpackaged, of four manufacturers of bearings, in violation of the statute. This conclusion disposes with finality of the defense offered by the accused. This defense, if valid, amounted only to the claim of lack of intent; that was a question of fact for the court to decide, and its decision cannot be disturbed. See *Miller* v. *United States,* 277 Fed. 721, 726 (4th Cir.).

It was urged in argument that there could be no fraud from the use of the labels in question and in the eventual sale of the contents of the boxes because the bearings sold or offered for sale were in fact the genuine product of the manufacturers designated. This argument is more disingenuous than plausible. A label is used to indicate manufacturing origin, and this connotes every process in manufacture until the article is finally placed in distribution or offered for sale. The counterfeit packages were used to pass off used merchandise as

new. See 52 Am. Jur., Trademarks, Tradenames and Trade Practices, § 120. An essential step in manufacture is inspection in order that imperfect merchandise may not reach the ultimate purchaser. The bearings in the present case were not inspected or sold by the original manufacturers. They had no value as new merchandise and trifling value as surplus goods, unwanted or undesirable for various reasons, including deterioration from handling or the elements. The close tolerances required in the manufacture of bearings and their preparation to withstand deterioration made inspection and packaging vital to the sale of the genuine product.

Moreover, what the law prohibits is not solely the imitation of merchandise under a spurious label but also the sale of genuine merchandise under the guise of authentic origin. The cost of distribution, including advertising and sales promotion, enters into the value of the goodwill created; and this goodwill the law is designed to protect. Thus, it has been held that even a genuine product obtained by one in bulk cannot be sold by him in a package, or under a label, used by the original manufacturer in the distribution of his packaged product. *Butler* v. *State,* 127 Ga. 700; see 52 Am. Jur. 596, Trademarks, Tradenames and Trade Practices, § 119.

There is no error.

In this opinion PRUYN and DEARINGTON, Js., concurred.