LUTHER BOARDMAN AND ANOTHER vs. MERIDEN BRITANNIA COMPANY.

A trade-mark, adopted by a manufacturer or trader for his goods, to become entitled to protection as his exclusive property, must in some manner designate the true origin or ownership of the goods.

The name of a manufacturer, used by him as a trade-mark, may have added to and connected with it some peculiar device as auxiliary to the name in declaring the true origin and ownership of his goods; and a wrongful violation of such a trade-mark may be effected even though the name of the imitator be substituted for that of the original manufacturer, by such an imitation of the device as indicates a design to deceive and is calculated to deceive the public as to the true origin and ownership of the goods.

Where figures indicating numbers are associated with the name of the manufacturer upon labels of certain form, color and general arrangement, and in connection with such labels are used by him to indicate his own manufacture, they may by virtue of that connection form an important part of a trade-mark.

A manufacturer of britannia spoons, for the purpose of distinguishing them from all other britannia spoons in the market, and for the purpose of designating different classes of his own spoons, adopted several different labels of particular size, form and color, with his own name thereon and some term descriptive of the spoons, and in connection therewith certain figures arbitrarily chosen, the different classes of spoons being indicated by fixed numbers. These labels constituted the only trade-mark under which he introduced his spoons into market, and under these labels and numbers the spoons had become generally and favorably known and a large demand had grown up for them, and they were generally bought and sold by the numbers on the labels. Held that the labels thus arranged and used constituted legal trade-marks and were entitled to protection.

Where another manufacturer made spoons similar in character to those above referred to, though differing somewhat in style, and prepared labels resembling the above, and adopted the same numbers for similar kinds of spoons, the labels being so similar that a purchaser who did not read the name upon them might be deceived, and being adopted with the particular numbers for the purpose of aiding the introduction of his spoons into the market, it was held to be a violation of the trade-mark of the first manufacturer, although the second manufacturer put his own name on the labels in the place of that of the first.

And it seems that the use of the figures with a cipher prefixed would not vary the case.

PETITION for an injunction against the use of certain labels claimed to be a violation of the petitioners' trade-mark, brought to the Superior Court in Middlesex county. The

following facts were reported by a committee to whom the case was referred.

The petitioners, Luther Boardman and Norman S. Boardman, are partners under the name of L. Boardman & Son, and ever since the formation of the copartnership in 1863 have carried on the business of manufacturing britannia spoons of various styles and sizes in the town of East Haddam in Middlesex County. In the year 1844, Luther Boardman commenced the business in the same place and carried it on alone down to the time when the copartnership was formed. The petitioners by the exercise of care, skill, and expenditure of money have succeeded in producing spoons of a superior and desirable quality, and have been accustomed for many years to prepare and put up the spoons so manufactured by them, in boxes packed, labelled, and numbered in the manner hereinafter shown. Luther Boardman, while carrying on the business alone, put up and packed his spoons in boxes of the same style and colors with these, and adopted these labels, and the numbers printed thereon, for the purpose of distinguishing the spoons of his manufacture from all other britannia spoons sold in market, and these labels, with the numbers thereon, had been used by him and by L. Boardman & Son, for a period of from twelve to twenty years prior to the year 1866, and during that time no other manufacturer used the same numbers, except that the numbers 1, 2, and 3, were used by all manufacturers to denote the size of spoons, and the number 5u had been used by a manufacturer by the name of Mix, but upon a different kind and style of spoons from those made by the petitioner. Green labels with black borders were common to all manufacturers of spoons, and to some extent steel colored labels were in use by other manufacturers, but no manufacturers during this time used labels precisely similar to those of the petitioners, and none used the same numbers except as above stated. The use of numbers was also common to all manufacturers of spoons and hollow ware to indicate the size, style and quality of the articles made by them. Luther Boardman devised the size, shape, and embellishment of the steel colored labels. The labels in connec-

tion with the name, " L. Boardman's " and especially the numbers thereon, constituted the only trade-marks under which the petitioners introduced their spoons into market. Under these labels and numbers their spoons had become generally known in market, and had obtained a good reputation, and there had grown up a large demand for them, and they were known by their respective numbers, and were generally ordered, bought. and sold by the numbers on the labels.

From the year 1853 to the year 1866 the respondents had been accustomed to purchase large quantities of spoons of the petitioners, put up, labelled and numbered in this way, for the purpose of selling the same to their own customers, and during this time they purchased and sold the spoons of the petitioners to the amount of $138,000. During this period the respondents were accustomed to advertise the spoons of Boardman for sale, on their published trade lists, by their respective numbers, the numbers representing the spoons of no other manufacturer but Boardman, but the name of Boardman did not appear on the trade lists, nor was there any thing on the trade lists to indicate who was the maker of the spoons, except the numbers.

In the year 1866 the respondents began to manufacture britannia spoons similar in character to those made by the petitioners, though differing somewhat in style or pattern, and prepared labels resembling those of the petitioners, except that their own name was substituted for that of L. Boardman, and adopted the same numbers that had been adopted by the petitioners, adapting the numbers to similar kinds of spoons. A sample of these labels is hereinafter given. The spoons so manufactured by the respondents were put up and packed by them in boxes, wrapped in manilla paper, and in all substantial respects were prepared for market in the same manner with the spoons of the petitioners before sold by them. The respondents have sold large quantities of their spoons so put up in place of spoons manufactured by the petitioners. But it is not found that they have so sold the spoons of their own manufacture under any false color or pretense that they were manufactured by the peti-

tioners, other than such as is to be inferred from the similarity of the labels used by them to the labels of the petitioners.

The labels of the respondents are so close an imitation of the labels of the petitioners that an unwary trader might be deceived, but no one reading the label would be deceived thereby. The respondents adopted the labels and numbers for the purpose of aiding the introduction of their spoons into market, not with any absolutely fraudulent design; but believing that numbers could not be legally claimed as a trade mark. They adopted the numbers without the consent of the petitioners, and as soon as the fact came to the knowledge of the latter that the respondents were using these numbers, the petitioners notified the respondents that the numbers on the labels were the trade-marks of the petitioners, and forbade the respondents using the same.

Since the service of the temporary injunction the respondents have continued to use the same numbers, placing an "0" before the same. They now fill orders for the old numbers, by sending the corresponding number which they have adopted by placing a cypher before it.

The following is a sample of the labels of the petitioners.

---

**1-2 Gross  L. BOARDMAN'S  No. 2340,**

**Wire Strengthened, French Tipped**

**TEA SPOONS.**

---

There were thirty-two different numbers used by the petitioners on their different labels, the different labels being used for different styles and sizes of spoons. They were generally green in color, but a few were of steel color. The following is a sample of the labels used by the respondents.

> ## 1-2 Gross MERIDEN BRIT^A CO'S No. 2340,
>
> ### Wire Strengthened, French Tipped, Oval Thread,
>
> # TEA SPOONS.

The different labels used by the respondents were of the same size and color as the corresponding labels of the petitioners, and the same figures were used for the same classes of spoons.

Upon these facts the case was reserved for the advice of this court.

*A. P. Hyde,* and *Culver* for the petitioners.

1. The finding fully establishes the following points: 1st, That these labels, especially the numbers thereon, constituted the trade-marks of the petitioners and were their property. 2d, That by long and exclusive use by the petitioners these trade-marks had become generally known in market, so that Boardman's spoons were generally ordered, bought and sold by these numbers, which thus became the most prominent and distinctive feature in the trade-marks. 3d, That they were of great value to the petitioners. 4th, That the respondents well knew the ownership, significance, and value of these trade-marks, and especially of Boardman's numbers.—These points being established, it clearly becomes the duty of a court of chancery to protect the petitioners in their rights by injunction whenever it is made to appear that other parties are endeavoring to appropriate these trade-marks to their own use, or are so far imitating them as to destroy or lessen their value to the petitioners as trade-marks.

2. The finding also establishes the facts, 1st, that the respondents have willfully imitated the trade-marks of the petitioners, for the purpose of enabling them to sell their own spoons; 2d, that through these means they have succeeded in selling large quantities of their spoons, in place of spoons manufactured by the petitioners, to the great loss and damage of the petitioners.—It would seem therefore that the right of the petitioners to an injunction is clear.

3. There is nothing in the finding which can change or modify this result. The committee "does not find that the respondents have so sold the spoons of their own manufacture under any false color or pretence that they were manufactured by the petitioners, *other* than such as is to be inferred from the similarity of the labels used;" but it is distinctly alleged that by *means* of *such labels* the respondents have been enabled to sell and have sold large quantities of spoons of their own manufacture as being of the manufacture of the petitioners. This is found to be true, and it is against the use of such labels that the petitioners seek to enjoin the respondents. But it is said that the committee finds that "no one reading the labels would be deceived thereby." It is however found that the labels are an imitation of the petitioners' labels, and calculated to deceive the unwary. And the respondents have not only imitated the various labels in their colors, sizes and forms, but have also imitated the petitioners in the color of their boxes, and mode of putting up the spoons for market in all respects, apparently with the intention of preventing any suspicion that they were not of the petitioners' manufacture, and thus guarding against any danger that the labels should be carefully read or scrutinized. When there is a strong resemblance in matter, color and arrangement, the court will presume that it was not fortuitous, but that it was intentional, with a view to mislead, and will enjoin against it. *Edlestone* v. *Vick*, 32 Eng. Law & Eq., 51; *Williams* v. *Johnson*, 2 Bosw., 7; Upton on Trade-Marks, 222. Though an imitation is only partial, if it is calculated and intended to mislead the public, courts will enjoin, if the success of the design is a probable or even possible conse-

quence.   1 Hilliard on Torts, 207, 208, and cases there cited;
2 Story Eq. Jur., § 951, and note.   The cases are numerous
where the defendant has been enjoined against the use of a
label or trade-mark, though he had placed his own name as
manufacturer in connection with the trade-mark.   *Milling-
ton* v. *Fox*, 3 Mylne & Cr., 338;  *Amoskeag Manufacturing
Co.* v. *Spear*, 2 Sandf. Sup. Ct. R., 605 ;  *Walton* v. *Crowley*,
3 Blatchf., 440 ;  *Seixo* v. *Provezende*, Law Reps., 1 Cha. Ap-
peals, 192 ;  *Clark* v. *Clark*, 25 Barb., 76 ; *Burnett* v. *Phalon*,
9 Bosw., 192.   In this case it must be  remembered that the
most prominent, valuable and distinctive feature in the trade-
mark was the numbers, as the petitioners' spoons had become
known in market, and were ordered, bought and sold by their
numbers alone, and in fact were advertised  for sale by their
numbers without the name of Boardman.    When the re-
spondents adopted Boardman's numbers, it enabled them to
fill the orders which they received for Boardman's spoons, by
sending their own of the same number, and  thus appropriate
to their benefit the good reputation which the petitioners had
acquired, and the  profits to which the  petitioners were enti-
tled.    And it can make no difference with the petitioners
whether the respondents counterfeited their trade-marks be-
cause they designed to defraud, or because they supposed
they had a right to counterfeit them.    The effect and injury
to the petitioners is the same and the court will enjoin against
it.   *Coffeen* v. *Brunton*, 4 McLean, 516.   Neither is there
any force in the claim of  the respondents that "numbers can
not be legally claimed as a trade-mark."   No reason exists
why a combination of  figures cannot be appropriated as well
as a  combination of letters or any other mark  or symbol.
Any mark or device which serves to distinguish the manufac-
ture of one man from all others, possesses all the elements of
a trade-mark and may be used as such.   It is expressly found
that Boardman adopted  these numbers for this purpose, and
that for  more than twelve years they did  serve this purpose,
and until his goods  had  become known in market by these
numbers, and  were  generally ordered,  bought and sold by

them.   2 Hilliard on Torts, 206, and cases cited ; *Ainsworth* v. *Walmsley*, Law Reps., 1 Eq. Cases, 518.

*Doolittle* and  *O. H. Platt*, for the respondents.

1.   A trade-mark is well understood to be a name, symbol, form or device, adopted by a manufacturer for the sole purpose of informing the public that the goods are his manufacture, and to distinguish his goods from all others by pointing out himself as the maker.  A trade-mark conveys the idea of the maker.  It is designed to represent the maker in such a way that the moment a man looks at it he shall know who made the article.  It is designed to designate the origin of the article on which it is placed.  All the authorities agree upon this.  But there is nothing either in the common paper box or in the labels used by the petitioners, except the name of "L. Boardman," to indicate the origin of these spoons. Take the name from the label, and there is nothing left to indicate to any one who should examine it who made the spoons.

2.   The material question in this case arises in regard to the use of numbers or numerals.  The petitioners allege in their petition that the figures, in all cases, were used "to denote that the spoons contained in the package were a certain pattern or size of spoons manufactured by said Luther Boardman, of the kind designated on said labels as wire-strengthened."  That is precisely the point.  They were used to indicate the different patterns ; they had reference to the pattern, not to the manufacturer.  When Boardman made this label, he put his name upon it *to indicate the maker.*  He used the words "*wire-strengthened*" to indicate *the manner of their manufacture.*  He used the *different numbers*, as 12, 20, &c., to indicate the *different patterns and sizes.*  He adopted the numbers for the same purpose that any other maker does, to indicate different classes of his goods.  In all the thread trade-mark cases, such as *Coats* v. *Holbrook*, 2 Sandf. Ch. R., 586 ;  *Taylor* v. *Carpenter*, id., 611;  *Same* v. *Same*, 3 Story R., 450 ;  *Same* v. *Same*, 2 Wood & Minot, 1 ;  *Same* v. *Same*,

4 Barb. Ab. of Chancellor's Decisions, 68; no claim was made that the numbers constituted any part of the trademark, or that any one could not adopt the same numbers. Numbers are not used to indicate the *origin* or *ownership* of the article, but have reference to its size or style. It is so understood in and out of the trade by everybody. They are not designed for that purpose. The numbers are not *instrumental* in representing to the purchaser the maker of the goods. This is doubly true when the maker's name is upon the goods for that purpose. If in any manner the numbers indicate the origin or ownership of the article, it is by *an association of ideas.* Certain figures suggest a meaning to the mind which the figures *do not in reality bear,* and were not *designed to convey.* A man has no right to appropriate words or figures in common use to indicate ownership, and if he does, or by the association of figures with his name they serve that purpose, that circumstance cannot prevent another person from using the same words or figures to indicate the pattern or size of goods made by him. This principle is laid down by Upton on Trade-Marks, 208, *et seq.* The leading case in America is the *Amoskeag Manufacturing Co.* v. *Spear,* 2 Sandf. Sup. Ct. R. 599. The learned judge says in that case:—"The owner of an original trade mark has an undoubted right to be protected in the exclusive use of all the marks, forms or symbols that were appropriated *as designating the true origin or ownership of the article or fabric to which they are affixed,* but he has *no right* to an exclusive use of any words, figures or symbols *which have no relation to the origin or ownership* of the goods, but are only meant *to indicate their name or quality.*" In *Stokes* v. *Landgraff,* 17 Barb., 608, the Supreme Court of the state of New York affirm the same doctrine in these words: "In all cases where names, signs, marks, &c., of any kind can be advantageously used to designate the goods or property, &c., he may use such as he pleases, *which. are adapted to that end,* and have not been before appropriated. In respect to words, marks or devices which do not denote the *goods or property, &c.,* of a person, but only the *kind and quality* of the article in which he deals,

a different rule prevails. *No property in such words or devices can be acquired.*" Hence it was held that the letters "A. C. A.," which meant "Amoskeag Company" by the first two letters, indicating ownership, and the last "A." the quality, could not constitute a trade-mark, and another person had a right to use them. Upton on Trade-Marks, 100, 130, 131. In the Amoskeag case the court further say : "A trademark is frequently designed to, convey information as to several distinct and independent facts, and therefore contains separate words, marks or signs applicable to each; thus indicating not only the origin or ownership of the article to which it is attached, but also its appropriate name, the mode or process of its manufacture, and its peculiar or relative quality." It is certain, however, that the use by another manufacturer of the words or signs indicative only of these circumstances, may yet have the effect of misleading the public as to the true origin of the goods. But it would be unreasonable to suppose that he is therefore precluded from using them as an expression of the facts which they really signify, and which may be just as true in relation to his goods as to those of another. Purchasers may be deceived. They may buy the goods of one person as those of another, but they are not deceived by a false representation. They are deceived because certain words or signs suggest a meaning to their minds, which they do not in reality bear, and were not intended to convey. *Corwin* v. *Daly*, cited in Law's Digest, 686, §§ 34—39. In *Davis* v. *Kendall*, 2 R. Isl., 569, Greene, C. J., delivering the opinion of the court, says :—"If the difference be merely colorable, it will not avail the defendant; but if the defendant state in his label that the article which he sells was made by himself, although he calls it by the same name as the plaintiff, he will not be liable;" citing *Canham* v. *Jones*, 2 Ves. & Beames, 218. The circumstance that we have formerly sold the petitioners' goods can make no difference. We had a right to buy and sell them. We had the same right to make them as we had to buy them, or as a stranger, and when we made them we could pack them in the ordinary way and mark them with our name. An action for a viola-

tion of a trade-mark, either in law or equity, is based upon the idea that the person is selling his own goods as those of another by a false representation. Now in this case the respondents falsely represent nothing. They use a common label, and publish to the world the fact that they make spoons No. 20. The words "L. Boardman's No. 20," convey the idea that Boardman has made some spoons of a size and pattern known as No. 20. The words "Meriden Britannia Company's No. 20," convey the idea that they have made the spoons in that package of a size and pattern known as No. 20.

3. The committee finds that while there is a similarity between the labels, so that an unwary trader might be deceived, no one reading the label would be deceived thereby. But how can the most unwary be deceived by means of the label? One could not be deceived by the label if he did not look at it. If he did look at it, he could not help reading it, and then he could not be deceived. The whole case shows conclusively that the respondents meant to tell, and did tell, that they made these spoons, and meant that the public should so understand it. They published in their catalogue, in unmistakable terms, that they made the spoons, and in this respect the case is stronger than the Amoskeag case, in which the court refused to enjoin against the use of the letters "A. C. A." by the respondents, who simply designated their goods as "Lowell Premium Tickings," which would not preclude the idea that the petitioners made the goods. On this point our own court say, "that if there is a substantial similarity, *so that the community would be likely to be deceived,* it is a sufficient infringement of the right." *Bradley* v. *Norton,* 33 Conn., 165. In *Croft* v. *Day,* 7 Beavan, 84, Lord Langdale declares the test to be, "whether the contrivances of the defendants were calculated to mislead the bulk of the unwary public." In *Welch* v. *Knott,* 4 Kay & Johns., 747, the plaintiff was a maker of soda water, in bottles labelled, "Schweppe & Co., 51 Berners street, Oxford street. *Genuine Superior Aerated Waters.*" The labels were colored, and pasted over corks, with a fac simile signature, "J. Schweppe & Co.," and the words, "By Special Appointment," and a figure of a crown on the label.

The defendant sold soda water in bottles stamped like the plaintiffs. A similar label was pasted over the cork, and on it was printed, in place of the words "J. Schweppe & Co.," the words "Soda Water," in similar characters to the printing on the plaintiff's label. A similar crown, with the other devices, were on the defendant's label. The resemblance was so close as to deceive the casual observer. Yet the Chancellor, Lord Cranworth, refused the injunction. In the case of *Partridge* v. *Menck*, 2 Sandf. Ch. R., 622, which was affirmed by Chancellor Walworth on appeal, the Vice-Chancellor Sandford refused the injunction, and used the following language:—"Although the court will hold any imitation colorable which requires a careful inspection to distinguish its marks and appearances from those of the manufacturer imitated, it is certainly not bound to interfere *where ordinary attention* will enable a purchaser to discriminate. It does not suffice to show that persons incapable of reading the labels might be deceived by the resemblance. It must appear that the ordinary mass of purchasers, paying that attention which such persons usually give when buying the article in question, would probably be deceived." So in the case of *The Merrimac Manufacturing Co.* v. *Garner*, 4 E. D. Smith, 387, the court say: "Courts are not bound to interfere where ordinary attention will enable a purchaser to discriminate." See also *Samuel* v. *Berger*, 24 Barb., 164.

CARPENTER, J. The office of a trade-mark is to designate the true origin or ownership of the article or fabric to which it is affixed. When any mark, symbol or device is used merely to indicate the name, quality, style or size of an article it cannot be protected as a trade-mark.

The object or purpose of the law in protecting trade-marks as property, is two fold; first, to secure to him who has been instrumental in bringing into market a superior article of merchandise, the fruit of his industry and skill; second, to protect the community from imposition, and furnish some guaranty that an article, purchased as the manufacture of one who has appropriated to his own use a certain name,

symbol or device as a trade-mark, is genuine. Consequently the violation of property in trade-marks works a two fold injury; the appropriator suffers, in failing to receive that remuneration for his labors to which he is justly entitled, and the public in being deceived, and induced to purchase articles manufactured by one man, under the belief that they are the production of another.

It must not be inferred, however, that an injury to the purchaser, and an injury to the proprietor of a trade-mark, must concur in any given case in order to maintain an action; as either, of itself, is sufficient to entitle the party injured to his legal remedy. Thus an imitator of a trade-mark may not defend, as against the true owner, by showing that the article sold by him is as good as the representation implied by the use of the trade-mark; while such fact may, perhaps, be shown in defence, or at least in mitigation of damages, in an action on the case by the purchasers. And on the other hand, in the latter class of actions, the injury to the original appropriator forms no part of the plaintiff's case.

A leading case on this subject is *The Amoskeag Manufacturing Co.* v. *Spear*, 2 Sandf. Sup. Ct. R., 599. Mr. Upton in his work on trade-marks, page 136, upon a careful examination of that case, has deduced from it certain principles, which seem to have been sanctioned and affirmed by later decisions; and which, with the exception perhaps of the last, may now be regarded as the settled law of this country. I quote only those which seem to have more immediate reference to the case now under consideration; and will then briefly apply them to the facts of the case.

"First—That a trade-mark, adopted by a manufacturer or merchant for his goods, to be clothed with the attributes of property, entitling the appropriator to protection in its exclusive use, must, by word, letter, sign, figure or symbol, designate the true origin or ownership of the goods.

"Second—That where a trade-mark is violated, the essence of the wrong done consists in the sale of the goods of one manufacturer as and for the goods of another, and therefore that such violation can only be predicated of a copy or imita-

tion of a trade-mark or those portions of a trade-mark which truly designate the origin or ownership of the goods.

"Third—That a similarity between two trade-marks, used by different manufacturers for their goods, although of such a character as to induce a belief in the mind of the public that they belong to and designate the goods of the same manufacturer or trader, is not, of itself, sufficient ground for a prohibition of the use of such trade-mark by him who did not first adopt it. That similarity, to entitle the originator to the protection of the law, must be such as to amount to a false representation, not alone that the two articles have the same origin, but that the goods to which the simulated mark is attached are the manufacture of him who first appropriated the trade-mark." * * * * * * *

"Fifth—That, a violation of a trade-mark consisting of a false declaration, by a copy or imitation of those parts of the trade-mark imitated which indicate the true origin or manufacture of the goods—it is not essential to the interposition of judicial restraint, that the imitation should be exact or perfect. Though a limited and partial imitation, containing variations that a comparison with the original would instantly disclose, it may yet be manifest that a resemblance exists, which was designed to mislead, and which has actually misled, the public, or probably, or even possibly, may do so, in that particular which constitutes the wrong.

"Sixth—That the name and address of the manufacturer, used by him as a trade-mark, may have added to, and connected with it, some peculiar device, vignette, emblem, symbols, forms or figures, adopted as auxiliaries to the name and address, in declaring the true origin and ownership of the merchandise, and a wrongful violation of such a trade-mark may be accomplished, even though the name of the original manufacturer be omitted, and that of the imitator be substituted, by such an imitation of the peculiar device, vignette, emblem, symbol, form, color or figure alone, as indicates a design and is calculated to mislead and deceive the public as to the true origin and ownership of the goods."

1. Both parties seem to regard the use of numbers as giv-

ing rise to the most important and most material question in the cause.    The petitioners rely upon them as the most prominent, valuable and distinctive feature in their trade-marks. The respondents claim that, if in any case numbers can be legally appropriated as trade-marks, they were not so appropriated in this case; and that, so far as they tend to indicate ownership, it is only so by an association of ideas, and by giving to them a meaning which they were not originally designed to have.    If this be so, or if the numbers were used solely to indicate the different patterns, styles or sizes, it is clear from the view we have taken of the law, that the respondents ought not to be restrained from their use.    Whether in any case numbers alone may be legitimately appropriated as trade-marks, is a question not necessarily involved in the case.    It may be difficult to give to bare numbers the effect of indicating origin or ownership ; and it may be still more difficult to show that they were originally designed for that purpose ; but if it be once shown that that was the original design, and that they have had that effect, it may not be easy to assign a reason why they should not receive the same protection, as trade marks, as any other symbol or device. But in this case the numbers were associated with the name of the petitioner, and the form, color and general arrangement of the labels ; and, by virtue of that connection, form an important part of the trade-mark itself.    By a reference to the facts found it will appear that Luther Boardman, one of the petitioners, " adopted the several labels, of the size, form and colors stated, and the numbers printed thereon, *for the purpose of distinguishing the spoons of his manufacture from all other britannia spoons sold in market.*"    And also, " that the labels described in the petition, in connection with the name ' L. Boardman,' and especially the numbers thereon, constituted the only trade-marks under which the petitioners introduced their spoons into market, that under these labels and numbers their spoons had become generally known in market and had obtained a good reputation, and there had grown up a large demand for the petitioners' spoons, that those spoons were known by their respective numbers,

and were generally ordered, bought and sold by the numbers on the labels."

From this finding we entertain no doubt that the labels thus arranged, adopted and used, constituted legal trademarks, and are entitled to protection.

2. Have the respondents violated the petitioners' rights by an imitation of their trade-marks? It seems that the respondents manufactured " spoons similar in character to those made by the petitioners, though differing somewhat in style or pattern, and prepared labels resembling those of the petitioners, and adopted the same numbers as had been adopted by the petitioners, adapting said numbers to similar kinds of spoons."

The presumption of a designed imitation, arising from the similarity of the spoons, the resemblance of the labels, and the identity of the numbers, would be very strong if all these circumstances were found to exist in reference to only one kind ; but when the case finds, as it does, that they do exist in respect to several different kinds, the presumption is vastly strengthened. It further appears that the similarity of the labels was " so close an imitation that an unwary trader might be deceived, but no one reading the label would be deceived thereby. That the respondents adopted the labels, and numbers, as set forth in the petition, for the purpose of aiding the introduction of their spoons into market, &c."

It is true that the respondents put their own name on the labels used by them, in place of that of the petitioners; but that is not sufficient to destroy the effect of the imitation in other respects ; especially in respect to the numbers. They had been in the habit of selling Boardman's spoons, and of selling them by their numbers. And when customers ordered spoons of a certain number of the respondents, they expected to receive Boardman's spoons. On receiving them the most prominent feature of the label, and the one most likely to attract attention, would be the number. That being right, and the labels generally resembling the petitioners', the name would hardly be likely to attract attention, and if it did, it is by no means certain that they would be particu-

lar to observe that the name indicated the makers of the article rather than dealers therein. The importance attached to these numbers is further shown by the fact that since the temporary injunction the respondents have used the same numbers with a cypher prefixed.

On the whole we are satisfied that, although the name of the imitator was substituted for that of the original proprietors, and that the imitation in other respects may not be exact, a resemblance exists, which was designed to mislead; and which, under the circumstances, was well calculated and likely to produce that result.

3. Have the petitioners suffered damage? On this point there is no room for doubt. The finding of the committee is explicit, " that said respondents have sold large quantities of their spoons so put up in place of spoons manufactured by the petitioners, as alleged in the petition." It is also apparent from what has already been said that the petitioners are in danger of still further loss unless protected by an injunction. The circumstance that the respondents now prefix a cypher to the numbers would hardly vary the result. Their motive is apparent. They may succeed in reaping some advantage from the numbers as thus used, but it is manifest that it will be at the expense of the petitioners.

We advise judgment for the petitioners.

In this opinion the other judges concurred.