CASE 50—PETITION EQUITY—NOVEMBER 29.

# Metcalfe v. Brand.

### APPEAL FROM LOUISVILLE CHANCERY COURT.

1. **TRADE-MARKS.**—A trade-mark may consist of a name or a device, or a peculiar arrangement of words, lines or figures, or any peculiar mark or symbol not theretofore in use, adopted and used by a manufacturer or a merchant for whom goods may be manufactured, to designate them as those which he manufactures or sells. It may be put either upon the article itself or its case, covering or wrapper, and is assignable with the business.

2. **SAME.**—While one who sells a product of a particular region of country can not appropriate the name of that region to indicate the article he sells, to the exclusion of others who produce or sell a similar product of the same region, yet a geographical name, as applied to a *manufactured* article, in connection with which the manufacturer was the first to use it, may acquire a *secondary* meaning, and thus become a valid trade-mark, but such a right will not be declared or protected unless clearly shown.

   In this case, in which the plaintiff claims the words "Lexington Mustard" as a trade-mark, and seeks to enjoin the defendant from using them to indicate mustard manufactured by him at Lexington, Ky., it is held that as it does not clearly appear whether the plaintiff's assignor or the defendant first began to use the word "Lexington" in connection with the word "mustard," and it was sometimes used by the plaintiff's assignor as an address, and sometimes as the name of the article, neither of the parties to the controversy will be allowed to appropriate the word "Lexington," in and of itself to his exclusive use as a trade-mark, although if the plaintiff had acquired the right to the use of the word he would be allowed to continue its use to the exclusion of the defendant, although he now manufactures his mustard in Louisville, while the defendant's is manufactured in Lexington.

3. **IMITATION OF LABEL.**—Every manufacturer has a right to indicate his goods in some way, as by a particular label or wrapper, and he is as much entitled to be protected in the use of a particular label or wrapper as in the use of a trade-mark. Therefore, if a label which has been adopted and is in use by a manufacturer to indicate his goods, be substantially imitated, and the imitation is so essentially like it that persons of ordinary observation and the unsuspecting public are likely to be deceived, it is sufficient to authorize equitable intervention.

Appellee and appellant were both manufacturers of mustard in Lexington, Ky. Appellant began the manufacture many years after appellee and those through whom he claims commenced the business. After appellant had been in business several years appellee moved his business to Louisville, Ky., and soon thereafter appellant commenced to use a blue label upon his cans similar in size, form and color to the label which had long been in use by appellee upon cans of the same size and shape; the letters used upon the two labels are of the same color and strikingly alike in size; the directions for use are the same, and the words of caution, although unusual, nearly resemble. In addition, the tops of the cans are fastened with a strip of cloth similar in color to that used by appellant for the same purpose. In this action by appellee against appellant to enjoin the imitation, *Held*— That appellant was properly enjoined from packing, labeling or marking his mustard with any colorable imitation of appellee's blue label, and also from using the words of caution thereon.

4. PLEADING.—If there was a defect of parties plaintiff, it was shown by the petition, and, therefore, as there was no demurrer upon this ground, the objection was waived.

R. W. WOOLLEY AND Z. GIBBONS FOR APPELLANT.

1. No one can acquire the exclusive right to use the name of a place as part of a trade-mark as against other persons manufacturing the same article in that place. (Canal Co. v. Clarke, 13 Wall., 311; Newman v. Alvord, 49 Barb., 588; Browne's Trade-marks, sections 83, 93, 111, 125, 127, 130, 133, 136, 143, 148, 155, 160, 162, 164, 166, 169, 182, 194; Brooklyn White Lead Co. v. Masury, 25 Barb., 416; McAndrews v. Bassett, 10 Jurist (N. S.), 550; Claudee v. Deere, 54 Ill., 439; Glendon Iron-works Co. v. Uhler, 75 Pa., 467; McMullin v. Dodge, MS Op., Ky. Ct. Ap.; Caswell v. Davis, 58 N. Y., 223; S. C., 17 Am. Rep., 233; Taylor v. Gillies, 59 N. Y., 331; S. C., 17 Am. Rep., 333.)

2. If the name of a place is used geographically, it can not constitute a trade-mark. (Browne's Trade-marks, section 193.)

The name in this case was intended to be, and has always been taken to be, geographical.

3. Unless the intent in using a trade-mark is to mislead the public by selling the goods as manufactured by the party seeking to prevent its use, he can have no claim therefor. (Gillott v. Esterbrook, 47 Barb., 455; Singleton v. Bolton, 20 O. L., 16; S. C., 3 Doug., 293.)

4. The court will not interfere when *ordinary* attention will enable purchasers to discriminate. (Rowley v. Houghton, 2 Brewster, 303; Singer Manf. Company v. Wilson, 2 Ch'y Div., 444; Blackwell v. Crabb, Coddington Dig., sec. 374; Crausbay v. Thompson, 4 Mann & Granger, 357; Cod. Dig., sec. 374; Bradury v. Beeton, Cod. Dig., sec. 906; Swift v. Dey, Cox's Cases, p. 319; Partridge v. Menk, 2 Sandf. Ch'y

Metcalfe v. Brand.

Rep., 625; Cosse v. Evans' Law Rep., 18 Eq., 138; Cod. Dig., sec. 395; Dawes v. Davis, Cod. Dig., 343; Cheavens v. Walker, Law Rep., 5 Chan. Div., 865; Gillman v. Hunnewell, 122 Mass., 143; Popham v. Cole, 66 N. Y., 76; Levy v. Walker, 10 Ch'y Div., 439.)

4. A manufacturer has no right to the exclusive use of a particular colored paper or kind of paper for covering or inclosing his goods in any particular form. (Faber v. Faber, 49 Barb., 357; Browne's Trademarks, 266, 272.)

5. Similarity of labels is not sufficient; it must amount to a false representation that the goods are the manufacture of the one who first adopted such label. (Dixon Crucible Co. v. Guggenheim, 2 Brewster, 321.)

6. Unless the case of infringement is very clear, a court of equity should not interfere. (Merrimac Man'f Co. v. Garner, 4 E. D. Smith, 487; Samuel v. Berger, 24 Barb., 163; Am. Trade-mark Cases, 193.)

7. A court of equity will never grant protection to a trade-mark that expresses a falsehood as against one that expresses the truth. (Helmbold v. Helmbold Man'f Co., Am. Law Reg., Mch., 1878, p. 179; Laird v. Wilder & Co., 9 Bush, 131; Fetridge v. Wells, 13 How. Pr. Rep., 385; Akron Cement and Lime Case, 51 N. Y., 189.)

Plaintiff brands his mustard "Lexington, Ky.," and makes it at Louisville. Defendant's mustard is called "H. C. Metcalfe's Lexington Kentucky Mustard," and is made at Lexington, Ky.

8. To entitle a trade-mark to protection it must be stamped, imprinted or attached in some way to the article itself, and not resting merely in the thought of the owner. It must be visible. (Claudee v. Deere, 54 Ill., 439.)

9. Such a secret process as that used by Burrowes, and which plaintiff claims to have purchased, is not a trade-mark; and the defendant is not liable even if he has discovered and used the secret. (Carmichael v. Latimer, 11 R. I., 395; S. C., 23 Am. Rep., 481.)

10. Osborne, being a partner with plaintiff, was an indispensable party (Civil Code, sec. 18); and as this defect of parties was not shown by plaintiff's petition, defendant's objection was made as provided by the Civil Code. (Secs. 92 and 118.)

SIMRALL & BODLEY FOR APPELLEE.

I. Appellee has the exclusive right to use the word "Lexington" as part of the name of manufactured mustard.

(a.) His predecessors in business so used the word long before any one else, and he acquired all their rights.

(b.) Although the word "Lexington," used geographically, could not be appropriated as a trade-mark, but used (as appellee and his predecessors have used it) not geographically, but in a secondary sense as the name of their mustard, it is a valid trade-mark.

Metcalfe v. Brand.

A trade-mark is a *seller's distinctive* mark or combination of marks adopted by prior use upon his merchandise and distinguishing it from merchandise of like kind sold by others. (Amoskeag, &c., Co. v. Spear, 2 Sand'f Sup. Ct. R., 599; Curtis v. Bryan, 36 How. Pr., 33; Delaware, &c., Co. v. Clark, 13 Wall., 311; Taylor v. Carpenter; Robinson v. Finley, 9 Ch. Div., 489.)

This distinctive quality of a trade-mark is the one the existence of which, in particular cases, the courts have been most troubled to determine. To be distinctive, a trade-mark must be specific, not generic; that is, must mark the merchandise of the claimant only, and not be descriptive of both his merchandise and that of others. Such a mark is thus distinctive unless it (1) *actually has* (recently) *been*, or (2) at the time of the claimed adoption *actually is*, or (3) may be *presumed to be* or (4) it may be *presumed will be* used by others upon their similar merchandise.

If these things be true, then the *actual* recent or present use of the mark by others will negative the claim of prior use and the claimant's right to the mark, and likewise the *presumed* present or future use of it by others will (upon grounds of public policy and to prevent conflicting claims) lead the courts to deny the right of the first user to appropriate the mark. (Faber v. Faber, 49 Barb., 357; Boardman v. Meridian Britannia Co., 35 Conn., 402.)

Certain classes of marks—words, letters, figures, etc., generally used in trade to describe quality, quantity, size, etc. (as " A No. 1," "Superfine," etc.) accordingly cannot be appropriated as trade-marks; for, without proof, they are presumed to be used to describe not one person's merchandise only but everybody's.

Geographical names of *natural* products (as " Kentucky" hemp, "Lackawanna" coal, &c.) are likewise descriptive of the qualities of such products; and since these may be sold by anybody, their descriptive geographical names can not be exclusively appropriated by any one. (Delaware, &c., Co., v. Clark, 13 Wall., 311.)

Not so as to geographical names not used geographically, but in a secondary sense, as part of the *name* of a *manufactured* article, the quality of which depends rather upon workmanship than the geographical origin of the materials used. So used, a geographical name is not descriptive of quality, and may be appropriated as a trademark. (Lea v. Wolff, 15 Abb. Pr. R. (N. S.), 1; Wolfe v. Barnett, 24 La. An., 97; Wotherspoon v. Currie, L. R. S. Eng., & Irish App. Cases, 508; McAndrews v. Basset, 10 Jurist, 490 and 550; Siegert v. Findlater, L. R., 7 Ch'y, 801; Hirst v. Denham, L. R., 14 Eq. R., 542; Blackwell v. Dibrell, 17 Amer. L. Reg., 516.) The following cases, apparently *contra*, are not except as to their *dicta*: In Candee v. Deere, 54 Ill., 439, the geographical words " Moline, Ill.," were used only in a geographical sense. In Brooklyn, &c., Co., v. Masury,

Metcalfe v. Brand.

25 Barb., 416; Wolfe v. Goulard, 18 How. Pr. R., 66, prior use was not shown.

Even geographical names of *natural* products can be appropriated as a trade-mark, if such products belong exclusively to the claimant, as " Congress Water," from Congress Springs. (The Congress, &c., Co., v. High Rock Co., 45 N. Y., 291; Dunbar v. Glenn, 42 Wis., 119; Radde v. Norman, L. R., 14 Eq., 348; Appollinaris Co. v. Nor· ris, 33 Law T. R. (N. S.), 242.)

Appellant could use the word " Lexington " *geographically* to show where he made or sold his mustard, but not *as part of the name* of his mustard. (Holloway v. Holloway, 13 Beav., 209; Sykes v. Sykes, 3 Barn. & Crcs., 541; Croft v. Day, 7 Beav., 84; Southorn v. Reynolds, 12 L. T. R. (N. S.), 75; Thorley's Cattle Food Co. v. Massam, L. R., 14 Chan., 748.)

(c.) Appellee having acquired a trade-mark right to the word " Lexington," did not lose it by removing his manufactory from Lexington to Louisville. (Clark v. Clark, 25 Barb., 76; Wotherspoon v. Currie, L. R., 5 Eng. & Irish App. Cases, 508, cited in Thorley's Cattle Food Co. v. Massam, *supra.*)

Nothstanding contrary *dicta* of this court in Avery v. Meikle, 81 Ky., 73 (appealed after argument of the present case), and the U. S. Supreme Court in Manufacturing Co. v. Trainer, 101 U. S., we submit that, under authorities, the claimant's using different marks to distinguish grades of quality of his own goods does not affect his right to appropriate the marks.

II. Appellant has fraudulently imitated both the trade name " Lexington," and the labels used by appellee and his predecessors, and should be enjoined.

BEATTIE & WINCHESTER on same side.

1. If Osborne was a necessary party, the objection to the petition on that ground was waived by the failure to file a special demurrer. (Civil Code, sec 92.)

2. The trade-mark in this case was assignable with the business and the factory in and at which the mustard was made and sold. (Wotherspoon v. Currie, Law R., 5 Eng. & Ir. App., 508; Dixon Crucible Co. v. Guggenheim, Cox's Cases, 560; Witthaus v. Mattfeldt Co., 44 Md., 303.)

3. Granting that appellant has a perfect right to use every word he does use in connection with the manufacture and sale of flour of mustard, still he has not the right to use them on a simulated package and label made in precise or colorable imitation of the appellee's, and intended or calculated to deceive the public. (25 Barb., 79; 23 Eng. L. & E., 53, 54; 2 Sand. Ch. R., 597; 4 McLean, 519; 2 Barb. Ch. R., 103; Filly v Fassett, 44 Mo., 173; Cox's Am. Trade-mark Cases, 540;

Amoskeag Man'f Co. v. Spear, 2 Sand. S. C. (N. Y.), 509; Cox's Am. Trade-mark Cases, 87; Burke v. Cassin, 45 Cal., 467; Amoskeag Man'f Co. v. Trainer, 101 U. S., 51; Coats v. Holbrook, 2 Sand. Ch. Rep., 586; Cox's Am. Trade-mark Cases, 30, 31.)

Where the court is of opinion that the use of a particular mark is likely to deceive, it will not require evidence of actual deception. If the degree of resemblance is such that ordinary purchasers, proceeding with ordinary caution, are likely to be misled, relief will be granted. (Braham v. Bustard, 9 Law Times (N. S.), 199; Amoskeag Man'f Co. v. Garner, 4 Am. Law Times R. (N. S.), 176; Curtis v. Bryan, 2 Daly, 312; Seixo v. Provezende, Law R., 1 Ch'y., 192; Bradley v. Norton, 33 Conn., 157.)

4. The name "Lexington" is not used by appellee as a geographical designation, but to designate flour of mustard made in accordance with a particular recipe, and is therefore a valid trade-mark.

Whenever the article is a manufactured and not a mere natural product, and the producer has given it a geographical appellation, which he was the first to use in connection with such article, and the name so given has, from long use in such connection, obtained a secondary signification, designating the article as of a particular origin, and not merely as made or produced at a particular place, then there may be a valid trade-mark in such appellation. (McAndrew v. Bassett, 10 Jurist (N. S.), 550; Seixo v. Provezende, 12 Jurist (N. S.), 215; Wotherspoon v. Currie, Law R., 5 Eng. & Ir. Appeal, 508; Radde v. Norman, Law R., 14 Eq., 348; Newman v. Alvord, 51 N. Y., 189; Lea v. Wolf, 15 Abb. Pr. (N. S.), 1; Appollinaris Co. v. Norrish, 33 Law T. R. (N. S.), 242; Kinney v. Basch, Cod. Dig. Trademarks, sec. 729, p. 255; Congress & Empire Spring Co. v. Rock Congress Spring Co., 45 N. Y., 291; McMullin v. Dodge, MS. Op., Ky. Ct. Ap.)

Cases commented on: Canal Co. v. Clark, 13 Wall., 311; Claudee v. Deere, 54 Ill., 439; Brooklyn White Lead Co. v. Masury, 25 Barb., 416; Glendon Iron Co. v. Uhler, 75 Pa. St., 467; Blackwell v. Wright, 73 N. C., 310.

5. A man cannot use any name, even though it be the name of the place of his residence, or his own name, as a trade-mark, or in connection with a trade-mark, if he so uses it for the purposes of fraud and deceit. (Croft v. Day, 7 Beav., 84; Cox's Am. Tr. Mark Cases, 649; Holloway v. Holloway, 13 Ib., 209; Ib., 662; Howe v. Howe Machine Co., 50 Barb., 236; *Ibid.*, 421; and other cases cited in Dixon Crucible Co. v. Guggenheim, Cox's Amer. Tr. M. Cases, 567-8, and 569-70.)

JUDGE HOLT DELIVERED THE OPINION OF THE COURT.

This case presents some interesting and rather novel trade-mark questions.

As early as 1810, one Burrowes began to make by a secret process a particular kind of mustard, at Lexington, Kentucky. It soon became noted for its excellence, and widely known as "Burrowes' Lexington Mustard," or more commonally as "Lexington Mustard." By this name it was quoted in the market, and soon had an extensive sale at a high price. It was put up in round tin cans of different sizes, with a label upon each of this character, in size, color, letters, words and other *indicia :*

Burrowes continued to manufacture, and put it upon the market in this form, and thus labeled, for nearly or perhaps quite thirty years ; and until his death, or near it, in or near 1841, when his wife succeeded to the business, and carried it on in the same way for several years, and until it was transferred to her son, Samuel D. McCullough. He appears at first to have continued the use of the same label ; but subsequently used a

different one of the following character, and in which the word "Lexington" is similarly used, save as to place:

He continued the business until 1869, when he sold out to the firm of Yates & Dudley; and they carried it on until July, 1877, when they transferred it to the appellee, J. H. Brand.

While conducted by them they used upon their packages this label:

They also used another label, different in color and other respects, upon which were these words *inter alia:* "Burrowes' Celebrated Lexington Mustard.

Manufactured by Yates & Dudley, Lexington, Ky."
They advertised it as "Burrowes' Lexington, Ky.,
Mustard," and appear to have branded some of their
cans, "Burrowes' Lexington Mustard."

Their contract of sale with the appellee, Brand,
dated July 12, 1877, speaks of it as "Burrowes' Lex-
ington, Ky., Mustard."

It had been manufactured during all this time in
the same building probably, and certainly in the same
locality; and Brand continued to so make it from
about the first of August, 1877, until September fol-
lowing, when he associated one Osborne with him, and
removed the business to Louisville, Kentucky, where
it was conducted under the firm name of John H.
Brand & Co.   They used two labels upon their cans or
packages, the following being that known as their blue
label, and which was used upon the round cans:

The ground color of the other was yellow, with
various devices and words upon it, among them being
"Burrowes' Celebrated Lexington Mustard;" and it
was used upon the square cans. They subsequently

also used the following label, which, as will be seen, is almost identical with that used by Burrowes:

And also by printed placards advertised their manufacture as "Burrowes' Lexington Mustard." So far as shown, however, all of the labels and advertisements used, after the removal to Louisville, showed upon their face that the firm was located there.

The tin cans used in putting up the mustard were round with flat tops, around which were pasted, in order to more securely fasten them, strips of light red or brownish cotton cloth.

The appellant, Metcalfe, began to make mustard at Lexington about 1873, and has so continued ever since. Some two or three years before Yates & Dudley sold out he used a blue label, but upon his square cans only, and it was, according to his own testimony, quite different and easily distinguishable from the blue

one used by them, and that subsequently used by the appellee, Brand. It is not exhibited in the record, but Metcalfe testifies, without contradiction, that it contained the words: "H. C. Metcalfe's Improved Lexington, Kentucky, Mustard." In November, 1877, he for the first time began to use upon his round tin cans, corresponding in size and shape with those then in use by the appellee, Brand, both the following label, and a strip of cloth similar in all respects to that then employed by Brand:

He also, in December, 1878, moved his manufactory into the same building where the Burrowes mustard had formerly been made.

The lower court held that the appellee, Brand, had an exclusive right to use the words, "Burrowes' Lexington Mustard;" that the appellant, Metcalfe, had the right to use the words, "H. C. Metcalfe's Lexington, Kentucky, Mustard;" but that his package with the strip of light red cloth around its top, and the blue label upon it, was an illegal imitation of Brand's package, and he was enjoined from using it and from

packing, labeling or marking his mustard with any colorable imitation of Brand's blue label, and also from using the words of caution on his (Metcalfe's) label from the end of the first line and after the word· "be," to the word "made," on the third line. He now, by this appeal, complains of this injunction.

The court below declined to decide whether Metcalfe could use the words, "Lexington Mustard " or "Lexington, Kentucky, Mustard," without being preceded by his name ; but decided that he might use the round tin can, or cotton strips to bind the top, or a paper label, provided they were not so combined as to colorably imitate Brand's package. The appellee, Brand, by a cross-appeal, also complains, insisting that he has an exclusive right to the use of the word, "Lexington," as a trade-mark in connection with the word " Mustard," and its manufacture. These complaints, therefore, present two questions.

First. Has the appellee, Brand, an exclusive right to the use of the word " Lexington " as the name, or part of the name, of his mustard?

Second. Has the appellant, Metcalfe, wrongfully and so far imitated, by label or otherwise, the article manufactured and offered for sale to the public by Brand, as to authorize equitable interference?

The law as to trade-marks is by no means ancient. It is one of the results of multiplied invention and modern commercial growth. Especially is the doctrine of equitable intervention for their protection of recent origin. The right to sue for their improper use doubtless arose originally from the common law right to maintain an action for a false representation ; and as

the wrong was calculated to work an injury not only
to the purchaser, but to the maker or manufacturer of
the article, a right of action at common law was given
to the latter in such a case.   Then the common law
advanced another step.   It was held that although the
original purchaser was not deceived, but knew who
was the real manufacturer, yet, if the trade-mark was
put upon the article in order to deceive a future pur-
chaser, and cause the public to believe that it was the
manufacture of the person to whom the trade-mark in
fact belonged, then this entitled him to sue, because it
was equally a deception.   Next, the courts of equity—
*aequitas supplet legem*—declared that although a per-
son had honestly purchased goods from one maker, with
the trade-mark of another upon them, or had manu-
factured them to order, not knowing that he was
wrongfully putting the trade-mark of another upon
them, yet he could not put them upon the market,
because it would both injure the true owner of the
trade-mark and deceive the public.   Thus, gradually,
the law extended its protecting arm until the right of
the first user to what is known as a trade-mark was
recognized, the underlying principle being, that one
person shall not be permitted to sell his goods as those
of another, or use the means likely to lead thereto,
thus not only injuring such other person but deceiving
the public.

It will aid us in the consideration of this case to
first see, under the rule of *stare decisis*, what princi-
ples of this branch of the law are to be regarded as
settled.   It is somwhat difficult to give a concise defi-
nition of a trade-mark.   It may consist, however, of a

name or a device, or a peculiar arrangement of words,. lines or figures, or indeed any peculiar mark or symbol,. not theretofore in use, adopted and used by a manufacturer, or a merchant for whom goods may be manufactured, to designate them as those which he manufactures or sells. It may be put either upon the article itself or its case, covering or wrapper, and is assignable with the business. The term cannot be properly applied to a mere label. It, however, may *contain* one. It may be the vehicle or embodiment of it. The object is to show *the origin* of the article. The general rule is against the use of mere words as a trade-mark. An exception to this, however, is where they indicate *origin, ownership or the maker*. If they are of common use, indicating merely kind or quality, as for instance "superfine," or "first quality," or are merely descriptive of the nature of the article, or of a *generic* character, as "hemp" or "cotton," then they cannot be so appropriated. (Amoskeag Man'f Co. v. Spear, 2 Sandford's Sup. Court. Rep., 599; Boardman v. Meriden Brittania Co., 35 Conn., 402; Helmbold v. Helmbold Man'f Co., 17 Am. Law Reg. (N. S.), 169; Manufacturing Co. v. Trainer, 101 U. S., 51.) Such words are the common property of all men. They may be used truthfully by one man, without infringing upon another's right, or creating a possibility of the public being thereby deceived. Thus the word "hemp" is a generic one, embracing the hemp of every man. The mark, "A No. 1," upon a firkin of butter, is a common one, indicating its quality. A trade-mark must be specific. It must mark the goods of the manufacturer as *his* goods, and not as his in common with all other persons.

Metcalfe v. Brand.

Keeping in mind the above rules, which we think will be conceded as now settled, we, in the light of them, proceed to the consideration of a question which is by no means beyond dispute. It is, can a person, under any circumstances, acquire a trade-mark right in the name of a place when associated with the name of the article *manufactured* by him? In other words, could the appellee, Brand, acquire an exclusive right to use the word "Lexington" as part of the name of his mustard? It is clear that prior use by him is essential to such a claim. (Manufacturing Co. v. Trainer, *supra.*) If he had acquired such right, then he could continue to use it after the removal of his manufactory to Louisville, provided he did so without fraud. Equity will not protect a trade-mark that expresses a falsehood as against one which expresses a truth. To do so would sanction a fraud. (Helmbold v. Helmbold Man'f Co., *supra.*) It, however, appears that the appellee's packages of mustard, put up after the removal, always located the firm in Louisville.

If a geographical name be used *as such*, it cannot be protected as a trade-mark. Clearly, all persons living in a town or city may use its name as an address; and of course many persons may make the same article in the same town, and show that it is so manufactured, by having the name of the place stamped upon it or printed upon the label or covering, as their address or place of business. Otherwise, monopolies, which are destructive of individual right and public interests, would be created and fostered. The right of one person to appropriate the name of a region of country to the exclusion of others

who produce or sell a similar product of the same region, may be regarded as settled by the Supreme Court in Canal Company v. Clark, 13 Wall., 311, commonly known as the "Lackawanna Coal Case." Lackawanna is the name of a considerable region of country. Lackawanna coal is a natural product of that region, and the name was descriptive of the general character or quality of the product. It not only indicated the place from whence the coal came, but the general *quality* of the article. Being *generic* and thus descriptive, it was held that each of the contestants had a right to call his coal "Lackawanna Coal;" but this case cannot be regarded as holding that the name of a place can, under no circumstances, become a trademark. The general qualities of a *natural* product are indicated by the name of the region from whence it comes. All have a right to sell it, and in doing so to call it by the name of the section where it is produced, or from whence it originally came, as that in effect *describes* the article.

Such a name indicates the quality, and not the producer or the ownership. All may use it with equal truth. It is not like a sale of one man's goods as those of another. There is no invasion of a man's business reputation, and no imposition practiced upon the public. For these reasons such phrases as "Sea Island Cotton," "Hungarian Grass," "Kentucky Hemp," or "Virginia Tobacco," will not be protected as trademarks. This is not so, however, of a *manufactured* article. The name of the place where it is made serves in no possible way to indicate its quality or composition; and where the manufacturer has given it a geo-

graphical name, which he was the first to use in connection with the article, it seems to us that it may, from long use in such connection, acquire a *secondary* meaning; and instead of designating the place where the article is made, indicate its origin, or that it is the product of a particular manufacturer, or made according to his method. When this is the case it becomes, in our opinion, a valid trade-mark. It then designates the *particular goods of · this one man.* The public so understand it; and this is the aim and end of a trade-mark. The name is no longer used to indicate the place where they are made, but becomes *the name of his goods.* It gives notice that he is the maker. It, by reason of first and continued use, and association with the name of the article made or sold by him, acquires an understood reference to him. It is the trade denomination of *his* article. It· acquires a secondary meaning in· connection with a particular manufacture.

Thus, we will suppose that John Doe has for years made at Mt. Sterling, Kentucky, a revolving book-case, which he has called during all that time "The Mt. Sterling Revolving Book-case." The materials out of which he constructs it come from different places; no one else has made such a case there, or used this name; and it does not express in any way the quality of the article, save as referring to Doe as the maker. The public, when they ask in the market for the "Mt. Sterling Revolving Book-case," understand that it is the one manufactured by him.

The name "Mt. Sterling," as used in this connection and under such circumstances, indicates the *particular*

*book-case of this one man.* His skill has given it ex-
cellence and reputation in the market, and justice to
him, as well as the protection of the public, require
that its name should be protected as a trade-mark. It
will create no monopoly. Upon the contrary, it will
serve to stimulate invention and competition. It will
not hinder Richard Roe or others from making the
same article at the same place, and using the name
of the place merely *geographically* or to show their
*place of business* or as their *address;* but they must
not use it as *the name of their book-case.* Indeed,
unless they aim to deceive the public, they would not
desire to so use it. If their article is as good or
better than that of Doe, there would be no incentive
to do so. It will not do to say in such a case that
as Roe's manufactory is at Mt. Sterling, therefore,
he, a new-comer, may give his book-case the same
name as Doe's, because equity will not enjoin against
telling the truth. It is done for deceit; and when so
done, it can not be said in a true sense that it is done
truthfully. It is at best but a nominal truth, amount-
ing to a deception. There is really a false represent-
ation, which equity, from a sense of common justice,
will enjoin. A person's name may be a trade-mark,
as "Decker Brothers" upon pianos. There may be
other brothers of the same name, and they could in
a certain sense truthfully use the same name upon
pianos, which they might subsequently begin to man-
ufacture ; and a man can not be deprived of the right
to use his own name; but in such a case he must use
it as *his own name, and not as the name of his goods.*

Each case must, of course, turn upon its own partic-

ular circumstances. Browne on the Law of Trade-marks, section 192, says: "A word may be considered to be geographical or not, according to the circumstances of the case," and evidently a distinction should be drawn between the use of a geographical name, indicating the particular *manufacture* of a certain person, and its use in describing a *natural* product of a particular locality, possessing qualities depending upon the place.

The above view, we think, is supported by both reason and authority. We shall refer to but few cases, although many have been examined.

In the Anatolia Liquorice Case (10 Jurist (N. S.), 550), the complainants were manufacturers of a new character of liquorice out of materials obtained from different places, upon which they stamped the name "Anatolia." The name as used was held to be a trademark. Mr. Browne, in speaking of this case, says: "This is a recognition of the doctrine that a geographical name may cease to be merely such, and acquire a new function as an arbitrary symbol." (Browne's Law of Trade-marks, section 184.)

The Glenfield Starch Case (5 E. & I. Appeals, 508) appears to have been well considered. There the plaintiffs, as in this case, were the assignees of the business, and had removed their manufactory from the little village of Glenfield to Paisley, but still continued to use the word "Glenfield" upon their starch. The defendant, residing at Glenfield, and doing business in the very house previously used by the plaintiffs, began to make what he termed upon his labels "Glenfield Starch." He was enjoined from so using

the name.  Siegart v. Findlater, L. R., 7 Chan., 801, is to the same effect.

The opinions in Newman v. Alford, 51 N. Y., 189, and Lea v. Wolf, 15 Abb. Pr. (N. S.), 1, appear to have been based mostly upon an intended fraud ; but where a trade-mark is infringed, the false representation, either directly or indirectly made, is really the essence of the wrong.

The Moline Plow Case (Candee, Swan & Co. v. Deere & Co., 54 Ill., 439), and that of the Brooklyn White Lead Company (25 Barb., 416), do not, when closely examined, raise any conflict.  In the one the word "Moline" was used as an address, while in the other the complainant was not the first user of the word "Brooklyn."

In the case now in hand, however, there is a conflict of testimony as to the prior use of the word "Lexington," in connection with the word "mustard."  The labels of Burrowes show that he used it as an address. There is evidence tending to show that both McCullough and Yates & Dudley used it both ways.  One of their labels indicates its use as a part of the name of their article, while another shows it as an address merely.  There was at most no uniformity as to its use by them.  It is shown that Metcalfe used it in connection with the word "mustard" upon a former label of his, and while Yates & Dudley were engaged in the business ; but the exact time when he began to do so does not appear further than that it was two or three years before they sold to Brand.  The evidence that either Metcalfe or Yates & Dudley used it with any uniformity as a distinctive part of the name of their

article is not of a satisfactory character. This uncertain use, whether as an address or as the name of the article, together with the doubt necessarily arising therefrom as to the prior use in the last-named way, forbid either party to this controversy from appropriating the word "Lexington," in and of itself, to his exclusive use as a trade-mark.

It was settled by the leading case of Amoskeag Company v. Spear, *supra*, and a line of cases following it, that such a right will not be declared or protected unless clearly shown ; and in the Moline plow case it was said : "The mark must be so clear and well defined as to give notice to others, and must not be deviated from at the suggestion of whim or caprice."

This rule does not of course interfere with the right of the same person to two different trade-marks ; but if he seeks to appropriate one to himself, he must do it by no uncertain use.

The question whether the appellant, Metcalfe, has so far imitated the packages of the appellee, Brand, as to entitle the latter to protection from a court of equity, remains to be considered.

Every manufacturer has a right to indicate his goods in some way, as by a particular label or wrapper. The law gives this right not only to secure to him the just reward of his skill and enterprise, but to protect the public from imposition and fraud. This is the basis of all legal interference in trade-mark cases, and upon principle a person is as much entitled to be protected in the use of a particular label as in the use of a trademark. If one uses the label of another, or a colorable imitation thereof, it is a false representation, done for

the purpose of imposing his goods upon the public as those of his rival in trade, thereby injuring the one and defrauding the other. Equity will not permit the use of means that are calculated to deceive and to divest another of his right. It will not permit A to sell his goods as those of B, or use means contributing to this end; and in preventing him from so doing, it proceeds both upon the ground of protection to A's right and the public interest. The simulation need not be exact. The label or covering need not be copied with slight changes even. If it be substantially imitated, and so essentially alike that persons of ordinary observation and the unsuspecting public are likely to be deceived, it is sufficient to authorize equitable intervention. There need be no *mala mens* toward the first purchaser of the imitation article. The simulation may enable him to retail it as the genuine article, but at a lower price, and thus injure the manufacturer and delude the public. Here, again, each case must depend upon its own circumstances.

How is it in this one? We have before us two *round* tin cans of the *same size*. The tops of each are fastened with a strip of *similar colored* cloth. One has upon it the *blue* label of Brand, and the other the *blue* label of Metcalfe. A glance is sufficient to satisfy one of the resemblance of the two packages, it is so striking. We would disbelieve the evidence of our senses if we were to doubt that the one is an imitation of the other. As to the labels, the *size* is the same; the *ground color* is the same; each has a *white* border; the *letters* are of the same color and strikingly alike in size; the *directions* for use are the same, and the

Metcalfe v. Brand.

*words of the caution,* although odd, nearly resemble. It is noticeable that the label of the appellee greatly resembles the blue label of both McCullough and Yates & Dudley. He began using it in the latter part of September or first of October, 1877. He moved to Louisville that fall; and then and in November, 1877, Metcalfe began for the first time to use this blue label, the cautionary words upon it, and the strip of cloth. He had formerly used a different blue label, but even it upon square cans only. It is impossible to account for all this imitation, so complete in form and detail, so likely to deceive, save upon the theory that the purpose was to obtain the benefit of the reputation of the appellee's mustard. It could hardly have been accidental. One can not be allowed to thus sail under a piratical flag.

Even if there was no intentional fraud, yet the simulation is such as is quite likely to deceive customers as to an article now on sale; and the impending or further actual injury to the appellee should be checked by injunction. (Burke v. Cassin, 45 Cal., 467; Partridge v. Menck, 2 Sandford's Chan., 622.)

It is one of the principal offices of equity to prevent injury and imposition. Therefore, even if the imitation was unintentional, yet be colorable, and of such a character that a majority of persons would never notice the difference, its use will be enjoined. Otherwise, the purchaser would have imposed upon him a spurious article, and the maker of the genuine be deprived of the profit which he has labored for years, perhaps, to realize. A person may of course use any color, or words in common use, or other *indicia,* upon

his label, or in connection with his goods; but fair
competition and common honesty require him to so
use them as not to imitate those of another. Any
other rule would but sanction fraud and deceit.

If there was a defect of parties plaintiff by the non-
joinder of Osborne, it was shown by the petition.
There was no demurrer upon this ground; and, there-
fore, under section 92 of the Civil Code, it was waived.

Judgment affirmed upon both the original and cross-
appeal.